IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **PRISON LEGAL NEWS**, a project of the **HUMAN RIGHTS DEFENSE CENTER**, | Case No.: 3:12-cv-00071-SI |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| **COLUMBIA COUNTY; COLUMBIA COUNTY SHERIFF'S OFFICE; JEFF DICKERSON**, individually and in his capacity as Columbia County Sheriff, | |
| Defendants. | |

Jesse Wing
Katherine C. Chamberlain
MACDONALD, HOAGUE & BAYLESS
1500 Hoge Building
705 Second Avenue
Seattle, WA  98104

Lance Weber
HUMAN RIGHTS DEFENSE CENTER
1037 Western Avenue, Second Floor
West Brattleboro, VT  05303

Marc D. Blackman
RANSOM BLACKMAN, LLP
1001 S.W. Fifth Avenue, Suite 1400
Portland, OR  97204

Of Attorneys for Plaintiff

Steven A. Kraemer
Gregory R. Roberson
HART WAGNER, LLP
1000 S.W. Broadway, 20th Floor
Portland, OR  97205

     Of Attorneys for Defendants

Lynn S. Walsh
209 S.W. Oak Street, Suite 400
Portland, OR  97204

     Of Attorneys for *Amicus Curiae* Partnership for Safety and Justice


**SIMON, District Judge**.

     This case primarily involves the constitutionality of a county jail's inmate mail policy that restricts all incoming and outgoing inmate personal mail to postcards only.  Plaintiff, Prison Legal News ("Plaintiff" or "PLN"), has sued Defendants Columbia County, the Columbia County Sheriff's Office ("CCSO"), and Sheriff Jeffrey Dickerson (collectively, "Defendants"), claiming that Defendants are violating free speech and procedural due process rights guaranteed by the First and Fourteenth Amendments to the United States Constitution. Defendants operate the county jail in Columbia County, Oregon (the "Jail"). On March 3, 2010, Defendants instituted an inmate mail policy that restricts inmates' incoming and outgoing personal mail to postcards only. PLN contends that Defendants' policy unconstitutionally burdens the free speech rights of both senders and recipients. PLN also contends that Defendants' mail policy unconstitutionally fails to require mail handlers at the Jail to provide notice to inmates and their correspondents, as required by the due process clause of the Fourteenth Amendment, when Defendants confiscate or return prohibited mail sent to or from inmates.

Before the court is PLN's Motion for a Preliminary Injunction, seeking to enjoin Defendants from enforcing "unconstitutional jail mail policies to reject or otherwise censor news journals, subscription materials, book offers, book catalogs, and other correspondence, and ordering Defendants to afford Plaintiff, other correspondents, and prisoners due process notice and an opportunity to challenge Defendants' censorship decisions." Dkt. 7. The court finds that under the free speech clause of First Amendment, made applicable to the states by the due process clause of the Fourteenth Amendment, Defendants' policy is likely to violate the free speech rights of both inmates and their correspondents. Accordingly, for the reasons stated below, the court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Preliminary Injunction (Dkt. 7). Not later than 30 days from the date of this Order, Defendants are enjoined from enforcing those portions of the inmate mail policy that restrict all incoming and outgoing inmate personal mail to postcards only.

## BACKGROUND

Defendants operate the Columbia County Jail, a correctional institution funded to incarcerate as many as 150 inmates. Declaration of Jeffrey M. Dickerson ("Dickerson Decl.") (Dkt. 32) at ¶ 24. The Jail employs 16 corrections deputies and five supervisors. *Id.* at ¶ 20. A typical "corrections shift currently has four deputies. The booking deputy on the swing shift processes and inspects all incoming and outgoing mail on a daily basis for compliance with the Jail's mail policy." *Id.* at ¶ 21.

On March 3, 2010, the CCSO adopted an inmate mail policy that provided, among other things, that "[a]ll correspondence to and from inmates of the Columbia County jail will be in the form of a post card unless it is legal or official mail." Dickerson Decl. Ex. B. (This policy will be referred to as the "postcard-only mail policy.") The CCSO adopted revised inmate mail policies

on July 19, 2011, and October 21, 2011. *Id.* Exs. C, D. These policies retained the postcard-only

mail policy. Although all three policies restricted incoming and outgoing personal mail to

postcards, each policy allowed inmates to receive books and periodicals sent directly from

publishers: "Books and/or periodicals may be procured from outside the jail, however, any such

book . . . must be sent directly from the publisher or bookstore via the U.S. mail."[1] Dickerson

Decl. Exs. B-D. On January 12, 2012, the CCSO substantially revised its inmate mail policy, and

on February 10, 2012, the CCSO adopted additional minor revisions. Dickerson Decl. Exs. E, F.

The parties agree that the February 10, 2012, inmate mail policy ("IMP") is the current mail

policy. Dickerson Decl. Ex. F; Oral Argument Transcript ("Transcript") at 8:9-11. The IMP

retains the postcard-only mail policy.

The Jail receives about 50 pieces of mail addressed to inmates each day, of which

approximately 35 to 40 pieces are personal mail. Declaration of Bryan Cutright ("Cutright

Decl.") (Dkt. 30) at ¶ 2. Inmates send about 40 pieces of mail per day. *Id.* Before the CCSO

adopted the postcard-only mail policy in March 2010, personal mail "was opened and the

envelope and papers inside were inspected for contraband[.]" *Id.* at ¶ 3. On average, CCSO staff

"spent 1.5 to 3 hours . . . inspecting the incoming and outgoing mail[.]" *Id.* After adopting the

postcard-only mail policy in March 2010, "the time it took [CCSO staff] to inspect incoming and

outgoing mail was reduced by one-third (approximately 30 to 60 minutes . . . )." *Id.* at ¶ 4.

---

[1]   Notwithstanding the provision in each policy that inmates may receive periodicals and
books, the CCSO website, when accessed by Plaintiff on January 10, 2012, indicated that the Jail
"do[es] not accept magazines" and magazines are "not allowed inside[.]" Declaration of
Katherine Chamberlain ("Chamberlain Decl.") (Dkt. 9) Ex. 1. In his declaration submitted
in response to PLN's motion for a preliminary injunction, Sheriff Dickerson stated that the mail
policies described on the CCSO's website were "incorrect" and the mail policies attached to his
declaration, and described above, are the "actual policies." Dickerson Decl. at ¶ 8.

PLN refers to itself as a "project of the Human Rights Defense Center." Declaration of

Paul Wight ("Wight Decl.") (Dkt. 8) at ¶ 2. The Human Rights Defense Center is a Washington

State non-profit corporation. *Id.* According to the Complaint, PLN

> publishes and distributes a monthly journal of corrections news and analysis and certain books about the criminal justice system and legal issues affecting prisoners, to prisoners, lawyers, courts, libraries, and the public throughout the Country. PLN also maintains a website . . . and operates an email list. Prisoners of all types, family and friends of prisoners, and prisoner advocates, are among the intended beneficiaries of PLN's activities.

Complaint ("Compl.") at ¶ 3.1. PLN has approximately 7,000 subscribers, and its publications

reach approximately 2,200 correctional institutions in the United States. Compl. at ¶ 4.2. Over

the past year, PLN has had an average of 20 subscribers in the Jail at any given time. Second

Decl. of Paul Wright (Dkt. 44) at ¶ 35.

In December 2010, PLN began sending copies of its publications and related items to

inmates in the Jail. *Id.* at ¶ 10. These include:

(1) PLN's monthly journal, "Prison Legal News." *See* Wright Decl. Ex. LLL;

(2) Informational brochures (one double-sided page). *See* Wright Decl. Ex. MMM;

(3) Subscription renewal letters. *See* Wright Decl. Exs. DDD-KKK;

(4) Book offers (one double-sided page). *See* Wright Decl. Ex. OOO.

(5) Book catalogs (one double-sided page). *See* Wright Decl. Ex. NNN; and

(6) Fundraising appeals. *See* Wright Decl. Exs. PPP-QQQ.

PLN combines informational brochures, book catalogs, and book offers into a single mailing that

it calls an "info pack." Wright Decl. at ¶ 15. PLN combines subscription renewal letters and

informational brochures into a single mailing that it calls a "subscription renewal pack." *Id.*

at ¶ 26. PLN sends info packs, subscription renewal packs, and fundraising appeals to inmates in

the Jail in envelopes by first-class U.S. mail. *Id.* at ¶ 11; *see, e.g., id.* Exs. A-D, DDD-HHH, PPP-QQQ.

PLN alleges that since 2010, the Jail has returned or failed to deliver dozens of PLN publications mailed to inmates, including PLN's journal, info packs, subscription renewal packs, and fundraising appeals. Wright Decl. at ¶ 13-14, 16-17, 26, 28; *see also* Compl. at ¶¶ 4.5 - 4.64. PLN editor Paul Wright submitted as exhibits to his declaration copies of PLN publications returned to PLN by the Jail. Many of the copies of envelopes included in these exhibits display stamps and stickers, apparently affixed by the Jail, stating variously: "RETURN TO SENDER," *e.g.* Wright Decl. Exs. A, I, O; "As of April 1, 2010 The Columbia County Jail ONLY ACCEPTS POSTCARDS[.] This applies to ALL incoming and out going mail," *e.g. id.* Exs. A-D, FF-II; "INSPECTED BY COLUMBIA COUNTY JAIL" (with several checkboxes, including checks next to "return to sender" and "refuse / violates security"), *e.g. id.* Exs. E, Q, U, W, AA; a stamp listing several options with the line near "Undeliverable as Addressed" checked, *e.g. id.* Exs. BB-DD; and a stamp listing several options with the line near "Refused" checked, *e.g. id.* Exs. JJ, QQ. In many cases, several of these markings are present on each envelope. *See e.g. id.* Ex. BBB.

Defendants concede that they returned or confiscated many PLN publications. In their Answer, Defendants admit allegations made in the Complaint that they rejected copies of PLN's journal, info packs, subscription renewal packs, and fundraising appeals sent to inmates in the Jail. Answer (Dkt. 25) at ¶¶ 4.25, 4.38, 4.48, 4.58. Defendants also admit that they did not provide PLN or inmates "due process notice or an opportunity to appeal" the rejection of PLN's publications. Compl. at ¶¶ 4.26-4.27; Answer at ¶¶ 4.26-4.27, 4.40-4.41, 4.50-4.51, 4.60-4.61. In

addition, Defendants admit that their past policies and practices "violated some of Plaintiff's constitutional rights." Answer at ¶ 1.1.

Notwithstanding these admissions, however, Defendants argue that they "have changed the inmate mail policy in a fashion that moots [P]laintiff's motion for preliminary relief[.]" Response to Plaintiff's Mot. for Preliminary Injunction ("Defs.' Resp.") (Dkt. 29) at 3. For "purposes of determining whether [PLN] is entitled to a preliminary injunction," they assert, "only the current [inmate mail] policy . . . is relevant." *Id.* at 4.

Defendants' February 10, 2012, revised inmate mail policy – the IMP – is the current inmate mail policy used by Defendants. The IMP addresses both what mail the Jail permits inmates to send and receive and what notification the Jail affords to inmates and their correspondents when mail is confiscated or returned.

The IMP divides most incoming and outgoing inmate mail into one of four categories: (1) privileged mail; (2) junk mail; (3) periodicals; and (4) personal mail. The IMP defines privileged mail as incoming or outgoing mail sent to or from an attorney, a court, or certain county or state law enforcement officials. IMP at 1-2. Junk mail is defined as "[p]rinted materials, often sent as mass mailings, such as catalogs, advertisements, brochures, circulars, and pamphlets whose primary purpose is to sell, promote or solicit for, a product or service, and when taken as a whole, lacks serious literary, artistic, political, educational, religious, or scientific value." *Id.* at 1. A "periodical" is defined as a "magazine, newspaper, or other publication formed of printed sheets that are issued at least four times a year at regular, specified intervals from a known office of publication ." *Id.* Personal mail is defined as "[p]ostcards mailed to or from family, friends, organizations, businesses, or other unofficial entities." *Id.* at 2.

The IMP's provisions governing inmates' rights to send and receive mail differ according to the category into which a particular piece of mail falls. In general, inmates may send and receive privileged mail with few restrictions. *Id.* at ¶¶ 12-17. In addition, inmates may receive nearly all junk mail unless it violates certain content restrictions, which are not at issue in this lawsuit. *Id.* at ¶ 10. The focus of Plaintiff's complaint concerns the third and fourth categories: periodicals and personal mail. As with earlier versions of the Jail's inmate mail policy, dating back to March 2010, the IMP contains a postcard-only mail policy for inmates' incoming and outgoing personal mail:

> Inmates may send postcards they receive in their initial inmate hygiene kit or through jail commissary. Inmates may receive postcards in any size that is delivered by the U.S. Postal Service up to a maximum size of 5-1/2" tall x 8-1/2" wide. *The jail does not permit any other form of personal mail for inmates.* Inmates are not limited to a specific number of postcards that they may receive or send. IMP at ¶ 3 (emphasis added).

Periodicals, including magazines, are permitted. The IMP permits inmates to receive periodicals, so long as they receive no more than three periodicals in one day and the periodical is "new and . . . delivered directly from the publisher or a bookstore." *Id.* at ¶ 20. The definition of periodical, quoted above, limits periodicals to those publications that are issued at least four times a year.

In addition to restrictions on the form and content of inmate mail, the IMP contains several notice provisions. The most extensive description of a mail handlers' responsibility to notify senders and inmates of confiscated mail is found in paragraph 30, located in a section of the IMP titled "Regulating Inmate Mail." It provides in relevant part:

> Normally, mail handlers confiscate prohibited items. The sender of confiscated mail must be notified pursuant to paragraph 31. . . .
>
> a.        . . .
>
> b.        Mail handlers will use a Prohibited Mail Slip to inform the inmate of the confiscation and use a copy as a tag for the items. They will place confiscated items in the inmate's property storage[.]

> c.    Mail handlers must notify the sender in writing that mail they sent was confiscated or not delivered to the inmate, unless the inmate is no longer in custody. They should use a Prohibited Mail Slip for the notification. Any notice will give the reason and explain how the sender can informally appeal the action.

Paragraph 31, located under the heading "Processing Incoming Mail," requires mail handlers to "[s]end a notice of right to reconsideration with returned mail. Send a notice of right to reconsideration to senders of confiscated mail."

In addition to these provisions, paragraph 45 provides that a mail handler should use a sticker or a stamp to mark "return to sender" when returning mail that violates the IMP. The handler must also "note the reasons for refusal on the stamp." *Id.* In addition, paragraph 45 provides that "[m]ail handlers will use a Prohibited Mail Slip to inform the inmate and the sender when mail is returned to sender." *Id.* Several other provisions require notice when inmate mail violates content restrictions. *See, e.g.,* paragraphs 21, 24, 27.

Attached to the IMP is an exemplar titled "Prohibited Mail Notice." IMP at 17; *see also* Dickerson Decl. Ex. H. The Prohibited Mail Notice (also referred to in the IMP as the "Prohibited Mail Slip") consists of check-boxes allowing a mail handler to indicate the reason that a piece of mail was returned or confiscated. The check-box choices include such items as: "personal mail and not on a post card"; "contains sexually explicit material"; "did not come directly from a publisher." At the bottom of the Notice is a paragraph describing the appeals process. The Prohibited Mail Notice used by the Jail is a triplicate carbon copy. One copy is sent to the sender, one copy is saved in the inmate's file, and one copy is provided to the inmate.

## PRELIMINARY LEGAL ISSUES

**A.    Mootness**

Defendants argue that Plaintiff's motion for a preliminary injunction is moot. A claim is moot "when the issues presented are no longer live or the parties lack a legally cognizable

interest in the outcome." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (internal quotation marks and citation omitted). "In other words, if events subsequent to the filing of the case resolve the parties' dispute, we must dismiss the case as moot[.]" *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1087 (9th Cir. 2011). Defendants argue that the IMP, adopted after PLN filed its lawsuit on January 13, 2012, resolves Plaintiff's claims. The IMP, Defendants contend, "allows inmates to receive postcards, junk mail, periodicals and books." Defs.' Resp. at 10. They also contend that "a process is in place for [PLN] to appeal the return of mail should such a return occur." *Id.*

Notwithstanding the revisions to Defendants' mail policy adopted in the IMP, PLN's suit is not moot because several areas of dispute remain unresolved. First, the postcard-only mail policy remains in effect. In addition to limiting correspondence between an inmate and the inmate's family and friends to whatever can be written on a postcard, this restriction prohibits PLN from sending info packs, subscription renewal packs, and fundraising appeal letters. Second, the IMP only permits inmates to send outgoing personal mail on postcards provided by or purchased from the Jail. This restriction prevents inmates from filling out and returning reply forms found in PLN's mailings. *See, e.g.,* Wright Decl. Ex. FFF (containing PLN reply forms). Third, as discussed in greater detail below, the IMP does not expressly provide that mail handlers must provide notice to inmates when they confiscate inmates' outgoing mail.

## B.    Standing

Defendants next argue that PLN "does not have standing to seek a preliminary injunction on its own behalf or on behalf of" the Jail's inmates and their correspondents. In general, to have standing to "seek injunctive relief, a plaintiff must show that he is under threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural

or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal quotation marks omitted) (citing *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). The party invoking federal jurisdiction – in this case, PLN – bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

PLN has met each of the requirements set forth in *Summers*. First, PLN has shown that it is under threat of suffering a concrete and particular injury in fact: The IMP prohibits inmates from receiving personal mail that is not on a postcard. Accordingly, the Jail is likely to reject PLN mailings, such as info packs, subscription renewal packs, and fundraising appeals, that are neither a periodical nor contained on a postcard. *See, e.g.,* Wright Decl. Exs. A-E, JJJ, KKK, MMM-PPP, and QQQ. Second, this threat is neither conjectural nor hypothetical: PLN has submitted evidence that the Jail has rejected PLN mailings, as well as incoming personal mail from inmates' family and friends. *See, e.g.,* Wright Decl.; 2nd Lennox Decl. at ¶ 5, Exs. C, E; *see also* Decl. of Patricia Mendoza (Dkt. 53) at ¶ 4 (Jail staff "told me that I was restricted to sending only postcards"). Third, this threat is traceable to Defendants' adoption of the IMP. Finally, if this court decides in PLN's favor, a preliminary injunction prohibiting Defendants from enforcing the IMP's postcard-only mail policy would prevent continued injury to PLN.

PLN has also demonstrated that it has standing pursuant to the "overbreadth doctrine." According to the overbreadth doctrine, a plaintiff "may challenge an overly broad statute or regulation by showing that it may inhibit the First Amendment rights of individuals who are not before the court." *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1112 (9th Cir. 1999). The "requirements of 'overbreadth standing' [are] injury-in-fact and the ability to frame the

issues in the case satisfactorily." *Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548,

554 (9th Cir. 2003). The injury-in-fact requirement does not require the plaintiff to show that its

own First Amendment rights are at issue; the plaintiff need only establish that the statute,

regulation, or policy caused it injury-in-fact. *Sec'y of State of Maryland v. Joseph H. Munson

Co., Inc.*, 467 U.S. 947 (1984) (even though the plaintiff's own First Amendment rights were not

at issue, it had standing to bring an overbreadth challenge on behalf of its clients because it

suffered a financial injury from the statute); *see also Clark v. City of Lakewood*, 259 F.3d 996,

1011 (9th Cir. 2001) (same).

PLN meets both requirements for standing under the overbreadth doctrine. First, as

demonstrated above, the IMP impedes PLN's ability to send info packs, subscription renewal

packs, and fundraising appeals to inmates; thus PLN has been injured-in-fact.[2] Second, PLN is

well-suited to frame the issues on behalf of inmates and their correspondents. PLN has been a

vigorous advocate on behalf of inmates in previous litigation in this circuit. *See, e.g., Prison

Legal News v. Lehman*, 397 F.3d 692 (9th Cir. 2005); *Prison Legal News v. Cook*, 238 F.3d 1145

(9th Cir. 2001). Furthermore, in this matter PLN has submitted numerous declarations from

inmates and their correspondents; these declarations demonstrate that PLN has invested time in

determining how the IMP has affected inmates and their correspondents. *See* Dkt. 10-14, 34-40.

Finally, PLN has framed its argument broadly; its briefing discusses alleged effects of the IMP

on inmates and their correspondents in addition to the effect on PLN alone. *See, e.g.,* Pl.'s Mem.

---

[2]  Even if the IMP allowed inmates to receive PLN's incoming mail without restriction –
including PLN's info packs, subscription renewal packs, and fundraising appeals – the IMP's
limitation to postcards only for inmates' outgoing mail would, nonetheless, injure PLN. This is
because many PLN mailings, such as the fundraising appeal letters and book order forms,
include reply forms. *See, e.g.,* Wright Decl. Exs. JJJ, MMM. The IMP restriction to postcards
only for inmates' outgoing personal mail prevents inmates from sending replies to these PLN
publications and, accordingly, could cause financial injury to PLN. Thus, PLN has demonstrated
a threat of injury-in-fact.

at 19-22 (discussing importance of letter-writing to rehabilitation and "exchange of ideas").

PLN's advocacy satisfies the requirement that PLN is able to represent inmates and their

correspondents' interests in this litigation.

## STANDARDS FOR PRELIMINARY INJUNCTION

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*,

555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show: (1) that he is

likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of

preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in

the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility"

of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify

a preliminary injunction).

In addition, the Supreme Court's decision in *Winter* did not disturb the Ninth Circuit's

alternative "serious questions" test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

1131-32 (9th Cir. 2011) ("'serious questions going to the merits' and a hardship balance that tips

sharply toward the plaintiff can support issuance of an injunction, assuming the other two

elements of the *Winter* test are also met'"). Thus, a preliminary injunction may be granted "if

there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the

merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the

public interest." *M.R. v. Dreyfus*, 663 F.3d 1100, 1108 (9th Cir. 2011).

## DISCUSSION

PLN's Complaint makes two principal claims based on 42 U.S.C. § 1983. In its first

count, PLN claims that the IMP violates PLN's First Amendment rights, as well as the First

Amendment rights of inmates at the Jail and their correspondents (the "speech claim"). Compl. ¶¶ 5.1-5.4. In its second count, PLN claims that the IMP violates PLN's Fourteenth Amendment due process rights and the due process rights of inmates and their correspondents (the "due process claim"). Compl. ¶¶ 5.5-5.8. PLN's motion for a preliminary injunction addresses both claims. It requests that the court enjoin Defendants from "(1) enforcing unconstitutional jail mail policies to reject or otherwise censor news journals, subscription materials, book offers, book catalogs, and other correspondence, and (2) ordering Defendants to afford to Plaintiff, prisoners, and other correspondents due process notice and an opportunity to challenge Defendants' censorship decisions." Pl.'s Mem. at 2. For the reasons described below, the court concludes that PLN has demonstrated that it is entitled to a preliminary injunction with respect to the speech claim but not with respect to the due process claim.

**A.    Free Speech Claim**

In its Complaint, PLN alleges that Defendants violate free speech rights in two ways: By restricting inmate personal mail to postcards and by prohibiting magazines. Compl. at ¶¶ 4.72 - 4.74. As noted above, after PLN filed its complaint, Defendants adopted a new inmate mail policy – the IMP. The IMP retains the postcard-only mail policy that has been in effect since March 2010. The IMP, however, expressly permits inmates to receive magazines.[3] IMP at 7. At oral argument, PLN acknowledged that the IMP provides that inmates may receive its journal: "I think that in the past there ha[s] been censorship where [Defendants] have identified that a

---

[3]  As noted above, although the CCSO's website stated that magazines were not allowed in the Jail, Defendants contend that the official mail policies have always allowed inmates to receive magazines. *See* Compl. Ex. A; Dickerson Decl. at ¶ 8; Defs.' Resp. at 3. Defendants "acknowledge that due to inconsistent practices on the part of jail staff, some mailings, including magazines[] from [P]laintiff[,] were not distributed to inmates up to and through January 26, 2012." Defs.' Resp. at 3.

magazine is not a postcard; and therefore, it is not allowed in. But I agree with [the court] that this current policy [the IMP] does not seem to say that." Transcript 22:16-20. Because the IMP permits inmates to receive PLN's journal, the court limits its consideration of PLN's free speech claim to the IMP's postcard-only mail policy for both incoming and outgoing personal mail.[4]

### 1.    Success on the merits

"Publishers have a First Amendment right to communicate with prisoners by mail, and inmates have a First Amendment right to receive this mail." *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) ("*PLN II*"). The scope and potency of these rights are, however, "subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security." *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1990). To determine whether a correctional institution's regulation that "impinges on inmates' constitutional rights" is valid, the court must determine whether that regulation "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

In *Turner*, the Supreme Court promulgated "a four-pronged test that guides courts in determining whether a challenged regulation passes constitutional muster." *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999). Under the *Turner* test, courts must determine:

---

[4]  At oral argument, PLN stated that "[w]e have brought both a facial challenge to the [inmate mail] policy, but we also have brought a challenge to the practices of the sheriff." Transcript at 9:18-20. Considering this statement, it could be construed that PLN also asserts an "as applied" challenge, claiming that Defendants are unconstitutionally failing to deliver PLN's journal. If PLN is bringing this claim, the court declines to consider it as part of PLN's motion for a preliminary injunction for three reasons. First, PLN's motion does not expressly request an order requiring Defendants to deliver PLN's journal. *See* Pl.'s Mot.; Pl.'s Mem. at 2. Second, neither the Complaint, nor PLN's briefing, develops this argument. Finally, there is inadequate evidence at this stage to determine whether Defendants have consistently failed to deliver PLN's journal since implementing the IMP.

(1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) ("*PLN I*") (citing *Turner*, 482 U.S. at 89-90). These factors apply not only to regulations governing inmates' rights receive mail but also "to regulations affecting publishers' rights to send materials to prisoners." *Id.* (emphasis omitted). "The first of these factors constitutes a *sine qua non*." *Walker*, 917 F.2d at 385. In other words, "if a regulation is not rationally related to a legitimate and neutral governmental objective, a court need not reach the remaining three factors." *PLN II*, 397 F.3d at 699.

### a.     Rational relationship

Under the first *Turner* factor, the court must "determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective."[5] *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). A "regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. Defendants contend that the IMP is rationally related to two penological objectives: the safety and security of the Jail's inmates and staff and the efficient use of the Jail's limited resources. Both are legitimate penological objectives. *Abbott*, 490 U.S. at 415 (the "legitimacy of the Government's purpose in [protecting prison security] is beyond question"); *Freeman v. Texas Dep't of Criminal Justice*, 369 F.3d 854, 861 (5th Cir. 2004) ("staff and space limitations, as well as financial burdens, are valid penological interests").

_____

[5] Whether a regulation is neutral depends on whether it operates "without regard to the content of the expression." *Turner*, 284 U.S. at 90. The parties do not dispute that the IMP is neutral.

The key question is whether the IMP is rationally related to enhancing security and improving efficiency. The correctional institution may demonstrate a rational relationship by showing "an intuitive, common[-]sense connection between the state's policy and its objectives." *Frost*, 197 F.3d at 356. If the plaintiff convincingly refutes this connection, the correctional institution "must demonstrate that the relationship is not so 'remote as to render the policy arbitrary or irrational.'" *PLN I*, 238 F.3d at 1150 (quoting *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999)). With respect to enhancing security, Defendants contend that the IMP's postcard-only mail policy is "rationally related" to the "security and safety of inmates and staff" because it prevents the introduction of contraband into the Jail. Defs.' Resp. at 15. Defendants state that contraband, such as "bio-hazards, . . . illegal drugs, needles, blades, similar weapons, and handcuff keys," can be "hidden in between sheets of paper and under postage stamps." *Id.* The Jail's IMP, "[l]imiting personal mail to postcards reduces these . . . security risks[.]" *Id.*

The court is unconvinced. Before the Jail implemented the postcard-only mail policy in 2010, the Jail opened and inspected mail for contraband. Cutright Decl. at ¶ 3; Dickerson Decl. Ex. A. Defendants have failed to offer evidence or even an intuitive, common-sense reason why the postcard-only mail policy more effectively prevents the introduction of contraband than opening and inspecting letters. In fact, the principal benefit of the policy identified by Sheriff Dickerson and Sergeant Cutright is not that inspecting postcards is more effective at preventing the introduction of contraband, but that inspecting postcards is quicker. *See* Cutright Decl. at ¶ 4; Dickerson Decl. at ¶ 16.[6] That is likely true. *Id.* The speed at which at mail handling staff can

---

[6] In his Declaration, Sergeant Cutright states that "[t]here is also less risk of contraband being present because a postcard is a standard-sized single piece of paper; contraband—such as bodily fluids and small metal objects—can be hidden between sheets of paper." *Id.* at ¶ 4. The court agrees that inspecting a postcard is *faster* than inspecting a letter; but Defendants do not present evidence that inspecting a postcard is more *effective* than inspecting a letter.

inspect mail, however, does not establish a rational link between the policy and reducing

contraband. *See PLN II*, 397 F.3d at 700 ("While the DOC's mailroom staff may have to spend

more time analyzing the content of non-subscription bulk rate mail and catalogs, such a ban on

non-subscription bulk rate mail and catalogs is not rationally related to the goal of reducing

contraband.").

This conclusion is consistent with Ninth Circuit precedent. The Ninth Circuit has

frequently rejected claims that policies broadly prohibiting certain classes of mail have a rational

relationship to enhancing security. *See, e.g., PLN I*, 238 F.3d at 1150 (correctional institution

"has presented no evidence supporting a rational distinction between the risk of contraband in

subscription non-profit organization standard mail and first class or periodicals mail"); *Morrison*

*v. Hall*, 261 F.3d 896, 902 (9th Cir. 2001) ("although the defendants presented evidence that

contraband is sometimes included in bulk rate, third, and fourth class mail, the defendants have

failed to present any evidence that the risk of contraband in first or second class mail is any

lower than the risk of contraband in mail that is sent bulk rate, third, or fourth class"); *Ashker v.*

*California Dep't of Corrections*, 350 F.3d 917, 923 (9th Cir. 2003) (invalidating requirement that

books mailed to inmates have an approved book label or vendor stamp as not rationally related to

reducing contraband, in part because correctional institution searches mail anyway); *PLN II*, 397

F.3d at 700 (overturning ban on requested bulk mail).[7]

---

[7]  Defendants cite several District Court cases from the District of Arizona addressing inmate mail policies. Only one, *Covell v. Arpaio*, 662 F. Supp. 2d 1146 (D. Az. 2009), thoroughly addresses each of the *Turner* factors. In *Covell*, the District Court held that the defendant's inmate mail policy, which limited inmates to receiving metered postcards, was reasonably related to a legitimate penological interest in reducing contraband smuggling. The District Court reached this holding for two reasons. First, the inmate mail policy in *Covell* prohibited the use of postage stamps. The defendant argued that correspondents could smuggle drugs into the jail under stamps. The District Court agreed. *Id.* at 1153-54. The District Court's rationale on this point is not transferrable here because the IMP does not forbid the use of

With respect to improving efficiency, Defendants argue that "inspecting personal mail on a postcard reduces by one-third the time the booking deputy must spend on inspecting incoming and outgoing mail." Defs.' Resp. at 16. In addition, Defendants claim that postcards "are quicker to inspect because they are easier to hold, easier to turn over, more durable than regular paper, and easier and quicker to inspect for prohibited content than notepad paper." *Id.* According to Sheriff Dickerson, without the postcard-only policy, "the time spent inspecting incoming and outgoing personal inmate mail would greatly increase, reducing the time available to staff for other tasks that are just as essential, and sometimes more essential, than inspecting the mail each day." Dickerson Decl. at ¶25.

Although Defendants' declarations establish that inspecting postcards is faster than opening and inspecting letters, the time-savings is too modest to demonstrate a significant rational relationship between the postcard-only policy and improving the Jail's efficiency. Sergeant Cutright stated that the time-savings per day amounted to 30 to 60 minutes each day. Cutright Decl. at ¶ 4. Compared to opening and inspecting letters, this amounted to a one-third reduction in the amount of time spent inspecting mail. *Id*. Defendants have failed to articulate how this small saving in time has meaningfully contributed to the Jail's efficiency. The Ninth Circuit, moreover, has consistently rejected claims that minimal or insignificant time-savings are rationally related to improving efficiency. *See, e.g., PLN I*, 238 F.3d at 1151 ("We do not believe that requiring delivery of non-profit organization standard mail will unduly burden the [correctional institution]"); *Morrison*, 261 F.3d at 903 (noting that in *PLN I* "we held that the

---

postage stamps. Second, the District Court found that the defendant's postcard-only mail policy prevented the introduction of "notepad bindings have been hollowed to conceal contraband." *Id.* at 1153. In this case, however, Defendants have not pressed the same argument. The Jail also might prohibit the mailing of notepads to inmates or confiscate notepads when opening and inspecting letters. In light of these considerations, the court declines to follow *Covell*.

'efficient use of staff time' argument cannot justify an effective ban on non-profit subscription publications"); *PLN II*, 397 F.3d at 700 (rejecting ban on for-profit subscription publications as not rationally related to controlling volume of mail).

### b.    Alternative avenues

Even though Defendants' postcard-only mail policy fails the *sine qua non* "rational relationship" test, it may be useful to consider the other *Turner* factors as well.  They all point in the same direction.

The second factor of the *Turner* test "is whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "In applying this factor, 'the right in question must be viewed sensibly and expansively.'" *Mauro*, 188 F.3d at 1061 (quoting *Abbott*, 490 U.S. at 417). Defendants contend that inmates and their correspondents may exercise their First Amendment rights by visiting and calling or by sending multiple postcards. Defs. Resp. at 18-19.

The court disagrees. The IMP's postcard-only mail policy drastically restricts an inmate's ability to communicate with the outside world. It prevents an inmate's family from sending items such as photographs, children's report cards and drawings, and copies of bills, doctor reports, and spiritual and religious tracts. *See, e.g.,* Decl. of John Weisenberger (Dkt. 39). It prevents an inmate's friends and other correspondents from sending printed copies of articles published in newspapers, magazines, or the internet. *See, e.g.,* 2nd Lennox Decl. It prevents educational, community, and religious organizations from sending lessons, book and periodical offers, and fundraising appeals. *See, e.g.,* Wright Decl. Finally, and perhaps most importantly, the postcard-only mail policy creates a hurdle to thoughtful and constructive written communication between

an inmate and his or her unincarcerated family and friends. *See* Decl. of Oana Popa (Dkt. 40); Decl. of Patricia Mendoza (Dkt. 53); Decl. of Sharon R. Berg (Dkt. 37).

These are not insignificant considerations. The limits imposed by the IMP's postcard-only mail policy not only restrain PLN and inmates' First Amendment rights, they inhibit rehabilitation. Indeed, the Supreme Court has noted that "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation." *Procunier v. Martinez*, 416 U.S. 396, 412 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

### c.    Effects on staff, inmates, and resources

The third *Turner* factor "is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. According to *Turner*, "courts should be particularly deferential to the informed discretion of corrections officials" when accommodating a constitutional right will have "have a significant 'ripple effect' on fellow inmates or on prison staff." *Id.* In *Turner*, the Court found that allowing certain inmate-to-inmate correspondence could "be exercised only at the cost of significantly less liberty and safety" for inmates and staff generally and, therefore, the court upheld certain restrictions on such correspondence. *Id.* at 92. This factor often weighs heavily when courts consider mail policies that restrict potentially disruptive content, such as depictions or descriptions of violence, escape, or criminal activity, sexually-explicit materials, and role-playing games. *See, e.g., Abbott*, 490 U.S. at 405; *Frost*, 197 F.3d at 351-52; *Bahrampour v. Lampert*, 356 F.3d 969 (9th Cir. 2004).

Here, accommodating letters and periodicals is unlikely to have a "significant ripple effect" on inmates and staff. Plaintiff does not challenge the IMP's content restriction; thus,

incoming letters may still be subject to screening for the sort of disruptive content considered in *Turner*, *Abbott*, *Frost*, and *Bahrampour*. Moreover, as explained above, the time-savings afforded to the Jail by the postcard-only mail policy is modest, at best.

        **d.**      **Easy and obvious alternatives**

The final *Turner* factor requires the court to "consider 'whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.'" *Morrison*, 261 F.3d at 905 (quoting *PLN I*, 238 F.3d at 1149). If a "claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91. This factor favors Plaintiff. As noted above, before implementing the postcard-only policy in 2010, Defendants opened and inspected letters. Cutright Decl. at ¶ 3. Given that opening and inspecting mail that is not restricted to postcards required only 30 to 60 additional minutes each day, it is an easy and obvious alternative.

The inmate mail policies in other correctional institutions also support this conclusion. Other jails in Oregon, as well the Washington State Department of Corrections and the United States Bureau of Prisons, have mail policies that permit inmates to send and receive letters and periodicals. *See* Declaration of Katherine Chamberlain (Dkt. 9), Exs. 4-6, 8. These policies provide further evidence that opening and inspecting letters is an easy and obvious alternative to the IMP's postcard-only mail policy. *Morrison*, 261 F.3d at 905 (policies at other correctional institutions are relevant to consideration of fourth *Turner* factor).

Considering all four *Turner* factors, the court concludes that Plaintiff is likely to succeed on the merits with respect to its free speech claim. In reaching this conclusion, the court recognizes that the potential dangers posed by contraband within the Jail are undeniably serious.

*See Florence v. Bd. of Chosen Freeholders of County of Burlington*, 132 S. Ct. 1510, 1518-20

(2012). Nonetheless, jail "walls do not form a barrier separating . . . inmates from the protections

of the Constitution." *Turner*, 482 U.S. at 84. Defendants' postcard-only mail policy blocks one

narrow avenue for the introduction of contraband—within envelopes—at too great an expense to

the First Amendment rights of inmates and their correspondents.

### 2.    Irreparable Harm

PLN has established that the IMP's postcard-only mail policy causes irreparable harm.

Both the Ninth Circuit "and the Supreme Court have repeatedly held that '[t]he loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury.'" *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009) (quoting *Elrod v.*

*Burns*, 427 U.S. 347, 373 (1976)). As discussed above, the IMP's postcard-only mail policy

restricts the First Amendment rights of both inmates and their correspondents. Because this

policy has been in effect since 2010, the harm is more than a mere possibility; it is continuous

and ongoing.

### 3.    Balance of Equities

The balance of equities tips in PLN's favor. PLN has established that the IMP's postcard-

only mail policy burdens its First Amendment rights, as well as the First Amendment rights of

inmates and their correspondents. Defendants face the possibility of spending 30 to 60 additional

minutes each day opening and inspecting letters. The constitutional hardship is far greater than

the modest impact on Defendants' time and resources.

### 4.    Public Interest

"The public interest inquiry primarily addresses [the] impact on non-parties rather than

parties." *Sammartano v. First Judicial Dist. Court, in & for County of Carson City*, 303 F.3d

959, 974 (9th Cir. 2002). "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009) (quoting *Bernhardt v. Los Angeles County*, 339 F.3d 920, 931 (9th Cir.2003)). Here, because the proposed preliminary injunction addresses the Jail's inmate mail policy, and would not otherwise significantly affect the operation of national, state, or local government, the public interest factor is largely neutral. To the extent that this factor affects the court's analysis, however, it favors PLN. A court order enjoining Defendants from enforcing the postcard-only mail policy will permit non-party members of the public to more easily communicate with inmates.

After considering each of the four factors set forth by the Supreme Court in *Winter*, the court concludes that PLN is entitled to a preliminary injunction that enjoins Defendants from enforcing those portions of the inmate mail policy that restrict inmates to sending or receiving personal mail only on a postcard.

**B.      Due Process Claim**

Inmates have a "Fourteenth Amendment due process liberty interest in receiving notice that [their] incoming mail is being withheld by prison authorities." *Frost v. Symington*, 197 F.3d 348, 353 (9th Cir. 1999). Defendants acknowledge this; in fact, Defendants contend that the IMP "provides notice and an opportunity for administrative review to the sender and recipient when mail is rejected." Defs.' Resp. at 21. At this stage of the proceedings, Defendants appear to be correct. The IMP provides substantially broader and clearer due process notice provisions than the Jail's earlier inmate mail polices. *Compare* Dickerson Decl. Exs. B-D. IMP paragraphs 30, 31, and 45, for example, require mail handlers to notify inmates and senders when the Jail

Page 24 – OPINION AND ORDER

confiscates mail. IMP paragraph 46 provides an appeals process. In addition, the "Prohibited Mail Notice," attached to the IMP, is a standardized form for mail handlers to use to inform inmates and their correspondents of the reasons mail was returned or confiscated and to explain the appeals process. IMP at 17.

Nonetheless, PLN contends that the IMP fails to guarantee procedural due process. PLN argues, for example, that the IMP does not expressly apply to outgoing mail. PLN also argues that several provisions of the IMP are confusing. Notwithstanding these arguments, the court declines to issue a preliminary injunction at this time regarding PLN's due process claim. Although the IMP's notice provisions are not a model of clarity, they appear to broadly afford due process notice to inmates and their correspondents, at least sufficient to withstand Plaintiff's motion for preliminary injunction.

Defendants, however, acknowledge that they must provide due process notice for outgoing mail. Indeed, they argue that the IMP requires the Jail to provide notice when outgoing mail is confiscated. Nonetheless, PLN appears to be correct that the IMP does not expressly require Jail staff to provide notice when confiscating or censoring outgoing mail. In the light of the court's order enjoining Defendants from employing a postcard-only mail policy, Defendants may also choose to clarify and restate the notice provisions in the IMP so that they clearly apply to outgoing as well as incoming mail and to address other arguably confusing provisions that may not rise to the level of a constitutional violation.

Finally, given that the IMP was only recently adopted, there is an insufficient evidentiary record to determine whether it has been consistently applied. All of these issues can be more fully developed at trial on the merits.

## CONCLUSION

Plaintiff's motion for a preliminary injunction, Dkt. 7, is **GRANTED IN PART AND DENIED IN PART**. Pending final resolution of this litigation, the court **ORDERS** that not later than 30 days from the date of this Order, Defendants must refrain from restricting all incoming and outgoing inmate personal mail to postcards only and shall not refuse to deliver or process personal inmate mail solely on the grounds that it is not on a postcard.

**IT IS SO ORDERED.**

Dated this 29th day of May, 2012.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge