# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **PRISON LEGAL NEWS**, a project of the **HUMAN RIGHTS DEFENSE CENTER**, | Case No.: 3:12-cv-00071-SI |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **COLUMBIA COUNTY; COLUMBIA COUNTY SHERIFF'S OFFICE; JEFFREY DICKERSON**, individually and in his capacity as Columbia County Sheriff, | |
| Defendants. | |

Jesse Wing and Katherine C. Chamberlain, Macdonald, Hoague & Bayless, 1500 Hoge Building, 705 Second Avenue, Seattle, WA 98104; Lance Weber, Human Rights Defense Center, 1037 Western Avenue, Second Floor, West Brattleboro, VT 05303; Marc D. Blackman, Ransom Blackman, LLP, 1001 S.W. Fifth Avenue, Suite 1400, Portland, OR 97204. Attorneys for Plaintiff.

Steven A. Kraemer and Gregory R. Roberson, Hart Wagner, LLP, 1000 S.W. Broadway, 20th Floor, Portland, OR 97205. Attorneys for Defendants.

**SIMON, District Judge.**

## INTRODUCTION

This case concerns the constitutionality of a county jail's inmate mail policies.

Defendants Columbia County, the Columbia County Sheriff's Office (the "CCSO"), and Sheriff

Jeffrey Dickerson (collectively "Defendants") operate the county jail in Columbia County,

Oregon (the "Jail"). Plaintiff Prison Legal News ("PLN") alleges that Defendants violated the First Amendment by rejecting dozens of PLN's publications and letters mailed to inmates incarcerated in the Jail. PLN also alleges that Defendants violated the Fourteenth Amendment by failing to provide both PLN and inmates with notice of and an opportunity to appeal the Jail's rejection of PLN's publications and letters. PLN alleges that these violations are traceable to three policies in effect at the Jail: (1) a policy limiting inmates' personal mail, both incoming and outgoing, to postcards only (the "postcard-only policy"); (2) a policy prohibiting inmates from receiving magazines (the "magazine policy"); and (3) a policy that failed to provide for constitutionally adequate procedural due process protections (the "notice and appeal policy").[1]

Based on these allegations, PLN makes two claims for relief under 42 U.S.C. § 1983, which provides a cause of action against state and local governments and their officials for violations of a person's federal constitutional or statutory rights. In its first claim, PLN asserts that Defendants' postcard-only and magazine policies violate PLN's First Amendment rights, as well as the First Amendment rights of inmates at the Jail and their other correspondents (the "speech claim"). Compl. ¶¶ 5.1-5.4. In its second claim, PLN asserts that Defendants' notice and appeal policy violates PLN's Fourteenth Amendment procedural due process rights and the procedural due process rights of inmates and their other correspondents (the "due process claim"). Compl. ¶¶ 5.5-5.8

---

[1] As discussed below, Defendants contend that they did not have "policies" that prohibited magazines or failed to provide constitutionally sufficient procedural due process. Rather, they contend that Jail staff merely failed to deliver magazines and afford proper notice in practice. Whether Defendants had such policies or Jail staff simply failed to deliver magazines and afford proper notice in practice is crucial to determining whether Columbia County, the CCSO, and Sheriff Dickerson in his official capacity are liable under 42 U.S.C. § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). In adopting the shorthand "magazine policy" and "notice and appeal policy," the Court merely names those portions of PLN's allegations and does not prejudge whether Defendants' conduct with respect to magazines and procedural due process protections was the result of "policies."

In response, Defendants maintain that the postcard-only policy is constitutional. They admit, however, that inmates have a First Amendment right to receive magazines and inmates and their correspondents have a Fourteenth Amendment right to procedural due process. Am. Answer at ¶¶ 1.1, 5.2, 5.6; Dkt. 203. Defendants also admit that they rejected dozens of PLN publications, including numerous issues of PLN's eponymous journal and that Defendants failed to provide PLN or the inmate-addressees with adequate due process notice and an opportunity to appeal those rejections. Am. Answer; Dkt. 203. Despite these admissions, Defendants contend that they did not have a "policy" of prohibiting magazines. Rather, they argue that CCSO staff simply, but incorrectly, rejected magazines notwithstanding an official "policy" that stated that magazines were permitted. Defendants also contend that CCSO staff failed to afford constitutionally sufficient procedural due process notwithstanding an official policy to the contrary.

Shortly after filing this action in January 2012, PLN moved for a preliminary injunction to enjoin Defendants "from enforcing unconstitutional jail mail policies" and to order Defendants to provide inmates, PLN, and inmates' other correspondents with procedural due process protections. Dkt. 7. In *Turner v. Safley*, 482 U.S. 78 (1987), the United States Supreme Court promulgated a four-factor test to guide courts in determining whether a correctional institution's challenged regulations satisfy constitutional requirements. On May 29, 2012, this Court issued an Opinion and Order granting in part and denying in part PLN's motion for a preliminary injunction. Dkt. 64; *Prison Legal News v. Columbia Cnty.*, 3:12-cv-00071-SI, 2012 WL 1936108 (D. Or. May 29, 2012). The Court found that PLN was likely to succeed in showing that Defendants' postcard-only policy failed to satisfy the four-factor test set forth in *Turner*. Accordingly, the Court enjoined Defendants "from restricting all incoming and outgoing inmate

personal mail to postcards only." Dkt. 64 at 26. On the basis of the record available at the time, the Court concluded that Defendants' inmate mail policy permitted magazines, although the Court noted that Defendants had admitted that they failed to deliver PLN's journal in practice. The Court found that there was an insufficient evidentiary record to determine whether Defendants unconstitutionally failed to afford inmates and their correspondents procedural due process.

In its preliminary injunction opinion, the Court also found that PLN had standing to assert its claims in two ways. Dkt. 64 at 10-13. First, the Court found that PLN had standing in its own right because Defendants rejected dozens of pieces of mail sent from PLN to inmates. Second, the Court found that PLN had standing pursuant to the "overbreadth doctrine." According to the overbreadth doctrine, a plaintiff "may challenge an overly broad statute or regulation by showing that it may inhibit the First Amendment rights of individuals who are not before the court." *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1112 (9th Cir. 1999). At that stage in the proceedings, the Court did not consider whether PLN had standing to obtain a permanent injunction. That issue is discussed in the Conclusions of Law below.

The Court denied PLN's motions for summary judgment, and the case was set for trial. Dkt. 125. In its Complaint, PLN requested a permanent injunction, declaratory relief, and nominal, compensatory, and punitive damages. Compl. at ¶¶ 7.1-7.3. Pursuant to Federal Rule of Civil Procedure ("Rule") 42(b), the Court bifurcated the case so that two separate trials could be held. Dkt. 198. The first trial, held February 6-8, 2013, was tried to the bench and is intended to resolve liability and, if appropriate, equitable relief.[2] After trial, the parties filed post-trial briefs. Dkt. 208-11. These Findings of Fact and Conclusions of Law address liability and equitable

---

[2] The parties agreed that the Court should resolve all liability issues without a jury. Pl.'s Trial Br. at 2; Defs.' Trial Br. at 2; Pretrial Conference Tr. at 7-8.

relief. A second trial, before a jury, may be necessary to resolve any remaining claim for damages.

## FINDINGS OF FACT

Based on the evidence presented at trial, the Court makes the following findings of fact pursuant to Rule 52(a). To the extent any of the findings of fact should more properly be considered conclusions of law, they should be treated as such.

### A.    Credibility of Witnesses

In these findings of fact, the Court relies on the testimony of the following witnesses who testified at trial: former CCSO Sergeant Bryan Cutright; former Jail Commander Jim Carpenter; former CCSO Sergeant Raquel Miller; former CCSO Sergeant Ralph Lee Rigdon; Undersheriff Andrew Moyer; Sheriff Jeffrey Dickerson; Paul Wright; and Patricia Mendoza. Having observed and considered the testimony of each of these witnesses, the Court concludes that they provided credible testimony.

### B.    The Parties

PLN is a project of the Human Rights Defense Center, whose mission is to "advocate for progressive reform and change within the nation's criminal justice system[.]" Wright Test. at 4.[3] PLN publishes a monthly magazine of the same name. *Id.* at 5. In addition, PLN operates several websites, publishes nonfiction reference books, arranges public speaking and advocacy on behalf of prisoners, and organizes campaigns seeking "reform and change within the criminal justice system both locally and nationally." *Id.*

PLN publishes and mails to inmates a variety of publications. These include:

---

[3]  At this time, neither party has ordered an official transcript of the trial. The Court's citations to the record are to unofficial and uncorrected transcripts. In the event that an official transcript is prepared, page numbers may differ.

(1)     PLN's monthly journal, "Prison Legal News." *See* Ex. 66;

(2)     Informational brochures (one double-sided page). *See* Ex. 67;

(3)     Subscription renewal letters. *See* Ex. 56;

(4)     Book offers (one double-sided page). *See* Ex. 69.

(5)     Book catalogs (one double-sided page). *See* Ex. 68; and

(6)     Fundraising appeals. *See* Ex. 64.

PLN combines informational brochures, book catalogs, and book offers into a single mailing that it calls an "info pack." Wright Test. at 16; *see, e.g.*, Exs. 1-27. PLN combines subscription renewal letters and informational brochures into a single mailing that it calls a "subscription renewal pack." *See, e.g.,* Exs. 56-63. Info packs, subscription renewal packs, and fundrainsing appeals are mailed in envelopes.

Sheriff Dickerson has served as the Sheriff of Columbia County since 2009. Dickerson Test. at 206. He is the "chief executive officer of the peace in Columbia County" and is paid by Columbia County. *Id.* Sheriff Dickerson runs the CCSO. *Id.* The CCSO employees the equivalent of 38 full-time employees. *Id.* at 139. At the time the Jail adopted the postcard-only policy in March 2010, the Jail had approximately 200 inmates. Cutright Test. at 81. The inmate population dropped to approximately 130 in May 2012. *Id.*; Dickerson Test. at 69. On average, the Jail processes approximately 35 pieces of outgoing inmate mail and 37 pieces of incoming inmate mail each day. Miller Test. at 176-77; Dkt. 201.

## C.      The Jail's Inmate Mail Policies

The parties introduced ten versions or iterations of the Jail's written inmate mail policy ("IMP") into evidence, ranging from the policy adopted in January 2008 to the policy adopted in July 2012. Exs. 113, 272-76, 297-300. The October 2011 IMP was the policy in effect when

PLN filed this action. Ex. 113. All of the IMPs distinguish between legal (sometimes called "privileged") mail and personal mail. Legal mail is inmate mail to or from individuals and agencies such as courts, attorneys, CCSO staff, the governor, and the state attorney general. *See, e.g.,* Exs. 113, 272. Inmates are largely free to send or receive legal or privileged mail without restriction. Personal mail is inmate mail to or from friends, family, organizations, and businesses. *See, e.g.,* Ex. 272.

**D.    The Postcard-Only Policy**

In 2009, Sheriff Dickerson, Undersheriff Moyer, and Commander Carpenter attended a conference of the Oregon State Sheriffs' Association. Carpenter Test. at 148. During the conference, the Washington County Sheriff's Office presented a session on postcard-only inmate mail policies. The Washington County Sheriff's Office advised attendees that a postcard-only policy would enhance the security and safety of jails and save time. Dickerson Test. at 144-45. Based on what he learned at the conference, Commander Carpenter believed that with a postcard-only policy "there would be less chance of contraband because there were not envelopes" in which to conceal contraband. Carpenter Test. at 150.

After the conference, the CCSO considered implementing a postcard-only policy. *Id.* at 135-37. Although one of the rationales for the postcard-only policy discussed at the conference was the prevention of contraband, the Jail did not have a problem with contraband arriving in the mail. Commander Carpenter testified that during his 22-year career at the Jail he could recall contraband entering the Jail through the mail only one time:

> [COUNSEL:] But the jail didn't have a problem with contraband coming in through the mail prior to the adoption of the postcard-only policy, did it?
>
> [MR. CARPENTER:] No, ma'am.

> [COUNSEL:] In fact, in your 22 year tenure, you can only think of one time when contraband may have come in through the mail?
>
> [MR. CARPENTER:] We believe so. Due to our diligence.

*Id.* at 134. Sergeant Miller, who processed the mail "many, many times" over the course of eleven years working for the CCSO, never personally found anything "unsafe" in the mail. Miller Test. at 162, 179. During a meeting convened to discuss implementing a postcard-only policy, no one stated that contraband had been entering the Jail through the mail. *Id.* at 136.

Another of the proposed rationales for adopting a postcard-only policy was that it could save time. The amount of time the Jail could save by switching to a postcard-only policy, however, was *de minimis*. Sergeant Rigdon testified that inspecting a letter required only a few seconds more than inspecting a postcard:

> [COUNSEL:] So you had a lot of experience processing inmate mail at the Columbia County Jail, right?
>
> [MR. RIGDON:] Yes, sir.
>
> [COUNSEL:]  And based on your experience it takes few moments or seconds to open an envelope; is that true?
>
> [MR. RIGDON:] Correct.
>
> [COUNSEL:]  And it takes a second or two to take the letter out of the envelope?
>
> [MR. RIGDON:] Yes.
>
> [COUNSEL:]  And it takes a few seconds to a scan a letter, right?
>
> [MR. RIGDON:] Yes. If it is one page, yeah. If it is several pages, it might take longer, but yeah.
>
> [COUNSEL:]  And it probably takes the same amount of time to scan a letter that it takes to scan a postcards?

[MR. RIGDON:] If we are talk talking about a one page type deal, I would say, yes, that's probably accurate.

[COUNSEL:]  So any increase [in the] amount of time [it takes] to process a letter versus a postcard is caused by opening a letter and taking the letter out of the envelope; is that correct?

[MR. RIGDON:] Yes, sir.

[COUNSEL:]  And that increased amount of time is a few seconds or a few moments, right?

[MR. RIGDON:] Well, I have never timed it, sir but yes.

Rigdon Test. at 11. Commander Carpenter added that he was unaware whether the postcard-only policy "actually saved any time." Carpenter Test. at 135.

Nonetheless, Commander Carpenter recommended to Sheriff Dickerson that the CCSO adopt a postcard-only policy. Dickerson Test. at 146-47. Sheriff Dickerson agreed and directed the CCSO to implement the policy. *Id.* at 147. Defendants have identified three reasons for why they adopted the postcard-only policy: (1) to makes their procedures consistent with other sheriffs' offices; (2) to prevent the introduction of contraband into the Jail; and (3) to save time. Cutright Test. at 76; Dickerson Test. at 53, 145. Although Defendants implemented the postcard-only policy, in part, to prevent the introduction of contraband into the Jail, Sheriff Dickerson agreed that he did not implement the policy "to solve a *known* problem" of contraband entering the Jail. Dickerson Test. at 54 (emphasis added).

At the time they adopted the postcard-only policy, Defendants believed that this policy would be constitutional. According to Commander Carpenter, "Washington [C]ounty said that [postcard-only policies] had been tested in other states and that it went through the courts in several other states and that they felt it was a legal thing to do." Carpenter Test. at 152-53. Sheriff Dickerson recalled "a presentation by Washington County that included a lawyer

advising that the limited knowledge so far about postcards was that it had been tried in at least one court" and that court found that a postcard-only policy was constitutional. Dickerson Test. at 147.

The March 2010 IMP was the first IMP at the Jail to adopt a postcard-only policy. Ex. 299. It provided that "[a]ll correspondence to and from inmates of the Columbia County jail will be in the form of a post card [*sic*] unless it is legal or official mail." Ex. 113. Under a heading labeled "Outgoing mail," the policy added that "[a]ll outgoing mail from inmates to their family and friends will be in the form of a postcard o[r] special occasion card that has been purchased from the Columbia County commissary account." *Id.* The Jail adopted revised IMPs in July 2011 and October 2011. Exs. 113, 300. Those IMPs retained the postcard-only policy in substantially the same form.

After PLN filed this action on January 13, 2012, the Jail adopted several revised IMPs. Exs. 272-76. The Jail's revised policies, promulgated in January, February, and May, retained the postcard-only policy. Exs. 272-74. The May 2012 IMP provided that "[e]xcept as otherwise provided below, personal mail may be sent and received by inmates only in postcard form." Ex. 274 at 3. Unlike the IMPs in effect before PLN filed this action, the January, February, and May 2012 IMPs contained an exception to the postcard-only policies for inmates who were within 30 days of completing their sentence. The Jail issued revised IMPs that did not contain a postcard-only policy after the Court issued its preliminary injunction on May 29, 2012. Exs. 275-76.

## E.  Magazines

All of the IMPs provided that inmates may receive periodicals, so long as the periodicals were sent directly from the publisher or a bookstore. Exs. 113, 272-76, 296-300. Nonetheless,

Defendants did not in fact allow magazines to enter the Jail. Jail staff did not consult or follow the IMPs when deciding whether to permit inmates to receive magazines. Dickerson Test. at 242; Moyer Test. at 188. Instead, Jail staff relied on the Jail's written inmate manual, which expressly stated that the Jail does "not accept magazines." Ex. 107-11; Cutright Test. at 46; Dickerson Test. at 243. Commander Carpenter testified that it was the CCSO's actual practice to prohibit magazines in the Jail. Carpenter Test. at 131. During the course of his 22-year career with the CCSO, Commander Carpenter only once observed a magazine arrive by mail for an inmate, and, on that occasion, Jail staff rejected it. *Id.* Sergeant Rigdon testified that he believed the Jail had a policy prohibiting magazines. Rigdon Test. at 5. Sergeant Miller testified that it was her understanding that magazines were not permitted in the Jail. Miller Test. at 21. On March 23, 2010, Sergeant Cutright distributed a memorandum to corrections staff and inmates that stated that "[m]agazines are not allowed inside the facility." Ex. 98; Cutright Test. at 52. That memorandum remained in inmate areas of the Jail until May 2012. Moyer Test. at 203. The CCSO's website also stated that magazines were not permitted in the Jail. Exs. 100-01. On two occasions, inmates filed inmate request forms asking if they could receive magazines. In both cases, Jail staff replied that magazines are not permitted. Exs. 143, 194; Cutright Test. at 57-58.

**F.    Notice and Appeal**

The Jail's IMPs state that inmates will receive notice when the Jail rejects incoming inmate mail. They also state that inmates should receive an opportunity to appeal the Jail's censorship decisions. The October 2011 IMP provided, for example:

> If mail is rejected the inmate/addressee will receive written notification explaining:
>
> i.    The correspondence has been rejected,
>
> ii.   The reason it was rejected,

      iii.     The process to informally appeal the rejection to the jail commander.

A copy of the notification will be placed in the inmate's file.

Ex. 113; *see also* Exs. 296-99. Notwithstanding this provision, CCSO staff "rarely" provided inmates with notice when the Jail rejected incoming mail. Cutright Test. at 61, 64-66.

The October 2011 IMP did not require Jail staff to notify the senders of incoming mail when staff rejected their mail. It also did not require Jail staff to notify inmates when the Jail rejected outgoing mail.

After PLN filed this action, the Jail adopted several substantially revised IMPs. These IMPs promulgated new rules governing notice and appeal requirements for incoming inmate mail. The January and February 2012 IMPs contained several paragraphs addressing notice. Ex. 272 (January 2012 IMP) and 273 (February 2012 IMP). Paragraph 30, located in a section of each of these IMPs titled "Regulating Inmate Mail," provided:

Normally, mail handlers confiscate prohibited items. The sender of confiscated mail must be notified pursuant to paragraph 31. . . .

a.     [ . . . ]

b.     Mail handlers will use a Prohibited Mail Slip to inform the inmate of the confiscation and use a copy as a tag for the items. They will place confiscated items in the inmate's property storage[.]

c.     Mail handlers must notify the sender in writing that mail they sent was confiscated or not delivered to the inmate, unless the inmate is no longer in custody. They should use a Prohibited Mail Slip for the notification. Any notice will give the reason and explain how the sender can informally appeal the action.

Ex. 273. Paragraph 31, located under the heading "Processing Incoming Mail," requires mail handlers to "[s]end a notice of right to reconsideration with returned mail. Send a notice of right to reconsideration to senders of confiscated mail." *Id*.

The February 2012 IMP also provided that "[m]ail handlers will use a Prohibited Mail Slip to inform the inmate and the sender when mail is returned to sender." *Id.* The Prohibited Mail Notice consists of check-boxes allowing a mail handler to indicate the reason that a piece of incoming mail was returned or confiscated. The check-box choices include such descriptions as: "personal mail and not on a post card"; "contains sexually explicit material"; "did not come directly from a publisher." At the bottom of the Prohibited Mail Notice is a paragraph describing the appeal process. Ex. 273. The January and February 2012 IMPs, however, did not provide that inmates should receive notice when the Jail rejected or censored outgoing inmate mail.

The Jail revised the notice and appeal provisions again in the May, June, and July 2012 IMPs. The July 2012 IMP, the most recent IMP received in evidence, provides for a notice and appeal process for both incoming and outgoing inmate mail. Ex. 276. With respect to incoming inmate mail, the July 2012 IMP provides that Jail staff will provide a Prohibited Mail Notice to both the sender and the intended inmate when the Jail rejects incoming mail. *Id.* For outgoing mail, the July 2012 IMP states that both "inmate and addressee will be provided with a Prohibited Mail Notice[.]" *Id.* A separate section addressing confiscated mail provides that if "a Jail Supervisor signs a Prohibited Mail Notice, the sender and addressee of the confiscated mail must be notified of the confiscation whether the disposition was to return the mail, store it, or destroy it." *Id.* The IMP provides an appeal process for both inmates and their unincarcerated correspondents. *Id.* A sample Prohibited Mail Notice is attached to the July 2012 IMP. Like the

Prohibited Mail Notice attached to the February 2012 IMP, it requires Jail staff to indicate the reason why the mail was rejected. *Id.* It also explains the appeal process. *Id.*

## G.    Effects of Defendants' Policies

The Jail returned or failed to deliver dozens of PLN publications mailed to inmates, including PLN's journal, info packs, subscription renewal packs, and fundraising appeals. Wright Test. at 17; Exs. 1-15, 17-50, 52-65; Dkt. 203. The Jail also returned nearly 20 letters sent from Lucy Lennox, an unincarcerated individual, to inmates. Exs. 71-87, 89. Inmates filed numerous grievances with the CCSO protesting the postcard-only policy. Exs. 130-33, 135, 140. Further, Defendants stipulated that they "did not provide PLN or the prison-addressees due process notice or an opportunity to appeal the censorship decisions when the Jail censored" PLN's mail. Dkt. 203. Defendants also stipulated that they "did not provide Ms. Lennox or the prisoner-addressees with due process notice or an opportunity to appeal the censorship decisions when the Jail censored" mail Ms. Lennox sent to inmates. *Id.*

In addition, the postcard-only policy prohibited inmates and their correspondents from sending a variety of items through the mail. Sheriff Dickerson confirmed that the policy would prohibit items such as children's report cards, bills in need of payment, and articles printed from the internet:

> [COUNSEL: The postcard-only policy] prevented families from sending their children's report cards, right?
>
> [SHERIFF DICKERSON:] They couldn't send the actual card.
>
> [ . . . ]
>
> [COUNSEL:] The postcard-only policy would prevent copies of bills being sent to prisoners, right?
>
> [SHERIFF DICKERSON:] Yes. Generally.

[COUNSEL:] Prevent sending doctors' reports?

[SHERIFF DICKERSON:] Yes.

[COUNSEL:] Would prevent copies of articles that were published in newspaper or magazines or on the Internet, right?

[SHERIFF DICKERSON:] Yes.

[COUNSEL:] Prevent educational, community or religious organizations sending in lessons, whether religious or otherwise, right?

[SHERIFF DICKERSON:] Yes.

Dickerson Test. at 78-79. Patricia Mendoza, whose husband was incarcerated in the Jail, was unable to mail her husband a legal document because of the policy. Mendoza Test. at 7.

In addition to preventing inmates and their correspondents from sending items through the mail, the postcard-only policy reduced the quality and quantity of communication between inmates and their correspondents. Sheriff Dickerson testified that the postcard-only policy limited the amount of space in which an inmate could write. He added that the limitation on space resulted in "a reduction in communication" and a "minimization of [inmates'] speech." Dickerson Test. at 74-75. The postcard-only policy also caused inmates and their correspondents to limit the topics they communicated about through the mail. Ms. Mendoza explained that she did not feel comfortable addressing some topics on postcards because they did not feel private: "I just didn't feel comfortable saying certain things because it is open mail. I didn't know if our local post office was going to read it. . . . I didn't feel comfortable writing certain things." Mendoza Test. at 4-5. She was also concerned that her children might read the postcards. "Normally we talk about our kids or financial issues. I was concerned about what he would write

on a postcard. If my kids were to check the mail I didn't know if they were going to read my mail." *Id.* at 5.

**CONCLUSIONS OF LAW**

As noted above, PLN seeks injunctive, declaratory, and monetary relief for violations of the First and Fourteenth Amendments. Pursuant to the Court's order bifurcating this case, presently before the Court is the issue of liability and, if appropriate, equitable relief.

## A.    Preliminary Legal Issues

### 1.    Standing

Defendants challenge PLN's standing to obtain a permanent injunction.[4] Defs.' Post-Trial Br. at 1-4. Defendants argue that because they "are no longer engaging in the conduct [that] plaintiff asserts is unconstitutional," there is "not a real and immediate threat that the same deprivation will occur in the future." Defs.' Post-Trial Br. at 1. Among other requirements, a plaintiff has standing to seek "injunctive relief only if he can show that he faces a 'real or immediate threat that he will *again* be wronged in a similar way.'" *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)) (emphasis added); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) ("To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized [and] the threat must be actual and imminent, not conjectural or hypothetical . . . ." (citation omitted)). The Ninth Circuit has described two ways in which a plaintiff may demonstrate that an injury is likely to recur: "First, a plaintiff may show that the

---

[4] Defendants also argued at the preliminary injunction stage of this litigation that PLN lacked standing and that this case was moot. In its preliminary injunction opinion, the Court rejected those arguments. *Prison Legal News v. Columbia Cnty.*, 3:12-cv-00071-SI, 2012 WL 1936108, at *5-6 (D. Or. May 29, 2012). Defendants' standing argument here applies only to PLN's request for equitable relief.

defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy. Second, the plaintiff may demonstrate that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (quoting *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001). (alterations in original). "Standing is determined by the facts that exist at the time the complaint is filed." *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001).

PLN has shown that its injuries stemmed from written policies or officially sanctioned patterns of practice that were in effect at the time PLN filed its complaint. As discussed below, at that time, Defendants maintained written policies and customs that restricted inmates' incoming and outgoing personal mail to postcards, prohibited magazines, and failed to provide for constitutionally sufficient due process notice.[5] PLN's injuries resulted from these policies and customs. As such, PLN has standing to pursue injunctive relief.

### 2.    Mootness

Defendants also argue that PLN's claims are moot, again because Defendants' have amended their policies. Defs.' Post-Trial Br. at 3. Unlike standing questions, mootness "inquiries . . . require courts to look to changing circumstances that arise *after* the complaint is filed[.]" *Clark*, 259 F.3d at 1006 (emphasis added). Nonetheless, a "defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 174 (2000). A case becomes moot only "if subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 189 (internal quotation marks and citations omitted) (emphasis added). The "party alleging mootness bears a heavy burden in seeking dismissal."

---

[5]  The existence and scope of these policies are discussed below.

*Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1173 (9th Cir. 2009) (internal quotation marks and citation omitted).

In response to the Court's preliminary injunction, Defendants eliminated the postcard-only policy. Further, Defendants have voluntarily amended the IMP to provide adequate due process protections and clarified that the Jail permits inmates to receive magazines. Nonetheless, it is not absolutely clear that Defendants will not reinstitute the postcard-only policy or the magazine ban in the future. Nor is it absolutely clear that Defendants will not roll back the IMP's procedural due process protections. Although Sheriff Dickerson testified credibly that he will not reinstitute any constitutionally violative policies, the position of Columbia County Sheriff is an elected office and a future sheriff may not choose to adhere to the same policies. Thus, Defendants have failed to meet their heavy burden of demonstrating that the allegedly wrongful conduct could not reasonably be expected to recur.

## B.     Liability

To prevail on a § 1983 claim, a plaintiff must prove by a preponderance of evidence (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (elements of § 1983 claim); *Dias v. Elique*, 436 F.3d 1125, 1129 (9th Cir. 2006) (a plaintiff must prove § 1983 claim by a preponderance of evidence).

There is no dispute in this case that Defendants acted under color of state law. Thus, the only question is whether Defendants violated rights secured by the Constitution. The Court considers this question separately with respect to the postcard-only policy, magazine policy, and notice and appeal policy.

### 1.  Postcard-Only Policy

PLN alleges that Defendants violated its First Amendment rights, and the First

Amendment rights of inmates and their correspondents, by rejecting inmate mail that was not on

a postcard. Compl. at ¶¶ 5.1-5.4. Defendants admit that they rejected numerous letters sent from

PLN to inmates. Dkt. 203. They contend, however, that their postcard-only policy does not

violate the First Amendment. Defs.' Post-Trial Br. at 6-11.

Publishers, such as PLN, "have a First Amendment right to communicate with prisoners

by mail, and inmates have a First Amendment right to receive this mail."[6] *Prison Legal News v.*

*Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) ("*PLN II*"). The scope and potency of these rights

are, however, "subject to substantial limitations and restrictions in order to allow prison officials

to achieve legitimate correctional goals and maintain institutional security." *Walker v. Sumner*,

917 F.2d 382, 385 (9th Cir. 1990). To determine whether a correctional institution's regulation

that "impinges on inmates' constitutional rights" is valid, the court must determine whether that

regulation "is reasonably related to legitimate penological interests."[7] *Turner v. Safley*, 482 U.S.

78, 89 (1987).

---

[6]  The First Amendment is made applicable against state and local governments by the Fourteenth Amendment. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964).

[7]  PLN contends that the standard articulated in *Turner* applies only to incoming mail, and the standard articulated in *Procunier v. Martinez*, 416 U.S. 396 (1974), *overruled in part by Thornburgh v. Abbott*, 490 U.S. 401 (1989), applies to prison regulations governing outgoing mail. Pl.'s Post-Trial Br. at 7. PLN is correct. *Martinez* "is controlling law in the Ninth Circuit and elsewhere as applied to claims involving outgoing prisoner mail." *Barrett v. Belleque*, 544 F.3d 1060, 1062 (9th Cir. 2008); *see also Abbott*, 490 U.S. at 413 ("[T]he logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence."). Nonetheless, it is unnecessary to apply the more demanding *Martinez* test to the postcard-only policy with respect to outgoing mail. Under *Martinez*, "the regulation . . . in question must further an important or substantial governmental interest unrelated to the suppression of expression," and "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." 416 U.S. at 413. The *Martinez* standard is more protective of inmate rights than the *Turner*

In *Turner*, the Supreme Court promulgated "a four-pronged test that guides courts in determining whether a challenged regulation passes constitutional muster." *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999). Under the *Turner* test, courts must determine:

> (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) ("*PLN I*") (citing *Turner*, 482 U.S. at 89-90). These factors apply not only to regulations governing inmates' rights to receive mail, but also "to regulations affecting publishers' rights to send materials to prisoners." *Id.* (emphasis omitted). "The first of these factors constitutes a *sine qua non*." *Walker*, 917 F.2d at 385. In other words, "if a regulation is not rationally related to a legitimate and neutral governmental objective, a court need not reach the remaining three factors." *PLN II*, 397 F.3d at 699.

### a.  Rational relationship

Under the first *Turner* factor, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (internal quotation marks and citation omitted). This requires the Court to "determine whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3)

---

standard because it requires a "closer fit between the regulation and the purpose it serves." *See Abbott*, 490 U.S. at 412. As explained below, the Court finds that the postcard-only policy fails to satisfy the *Turner* test with respect to both incoming and outgoing mail. Because the restrictions limiting outgoing personal mail to postcards fail to survive the more deferential *Turner* test, the Court need not also consider whether those restrictions survive the more demanding *Martinez* test.

whether the policy is 'rationally related to that objective.'" *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999) (*en banc*) (quoting *Abbott*, 490 U.S. at 414).

As discussed in the Findings of Fact, Defendants identified three objectives in adopting the postcard-only policy: (1) to standardize their procedures with other sheriffs' offices; (2) to enhance security; and (3) to promote efficiency. Security and efficiency are legitimate penological objectives. *Abbott*, 490 U.S. at 415 (the "legitimacy of the Government's purpose in [protecting prison security] is beyond question"); *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 861 (5th Cir. 2004) ("staff and space limitations, as well as financial burdens, are valid penological interests"). Standardizing procedures with other sheriffs' offices, however, is not a legitimate penological objective. Achieving consistency in mail policies between correctional institutions may streamline administration. Even so, the administrative convenience achieved by such standardization is not in itself a penological objective except to the extent that doing so may indirectly support security or efficiency.

Whether a regulation is neutral depends on whether it operates "without regard to the content of the expression." *Turner*, 284 U.S. at 90. The postcard-only policy provides for no restrictions based on content, and the parties do not dispute that it is neutral.

The remaining question under the first factor is, therefore, whether the postcard-only policy is rationally related to the objectives of enhancing security and promoting efficiency. A "regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. Although the Court must uphold a regulation that bears a rational relationship to a legitimate penological interest, this standard "is not toothless." *Abbott*, 490 U.S. at 414 (1989) (internal quotation marks and citation omitted). "*Turner* requires prison authorities to show more

than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006).

The government may demonstrate a rational relationship by showing "an intuitive, common[-]sense connection" between the Jail's policy and its objectives. *Frost*, 197 F.3d at 356. If the plaintiff does not "present sufficient evidence to refute [that] common-sense connection . . . '[the government] need not prove that the banned material actually caused problems in the past, or that the materials are "likely" to cause problems in the future.'" *PLN I*, 238 F.3d at 1150 (quoting *Mauro*, 188 F.3d at 1060). "The only question is whether prison administrators reasonably could have thought the regulation would advance legitimate penological interests." *Id.* If, however, the plaintiff presents sufficient evidence to refute the government's common-sense connection between the regulation and its objectives, the government "must present enough counter-evidence to show that the connection is not so 'remote as to render the policy arbitrary or irrational.'" *Frost*, 197 F.3d at 357 (quoting *Mauro*, 188 F.3d at 1060).

There is not an intuitive, common-sense connection between the postcard-only policy and enhancing jail security. Defendants contend that a postcard-only policy enhances security because contraband may be concealed within envelopes. Carpenter Test. at 150; Defs.' Post-Trial Br. at 7. This rationale, however, is only compelling to the extent that it is compared to a policy of permitting inmates to send and receive letters without the jail opening envelopes and inspecting their contents. Compared to a "no inspection" policy, Defendants are undoubtedly correct that there is a common-sense connection between adopting a postcard-only policy and enhancing security. If Jail staff did not open and inspect envelopes and their contents, inmates and their correspondents could easily send and receive contraband. Before adopting the postcard-

only policy, however, the Jail did not have a "no inspection" policy. Instead, CCSO staff opened and inspected letters to and from inmates. Miller Test. at 170. To determine whether there is a common-sense connection between the postcard-only policy and enhanced security, the Court must analyze the postcard-only policy within the context of the Jail's other practices and regulations. *See PLN I*, 238 F.3d at 1150 (rejecting state's argument that ban on certain mail reduced prisoner's accumulation of paper, and hence fire hazards, because separate prison regulation already limited amount of paper prisoner may store in cell). When the postcard-only policy is compared to a policy of opening envelopes and inspecting their contents, the rational relationship between the postcard-only policy and enhancing security dissolves. Defendants did not at trial, and do not in their post-trial briefing, offer *any* explanation why a postcard-only policy is more effective at preventing the introduction of contraband than opening envelopes and inspecting their contents. Defendants have, therefore, failed to present "an intuitive, common[-]sense connection" between the postcard-only policy and enhancing security.

Even if there were a common-sense connection between the postcard-only policy and enhancing security, PLN presented evidence that convincingly refutes that connection. Defendants did not have a problem with contraband entering the Jail through the mail. In fact, Defendants concede that there were "*at most*[] one or two instances where contraband may have entered the facility through the mail[.]" Defs.' Post-Trial Br. at 7 (emphasis added). Sheriff Dickerson agreed that the postcard-only policy was not adopted in response to a *known* contraband problem. Defendants' postcard-only policy was a solution in search of a problem.

Under Ninth Circuit precedent, Defendants need not prove that there have been past episodes of contraband entering the Jail through the mail in order to establish a rational connection between the postcard-only policy and enhancing security. *Casey v. Lewis*, 4

F.3d 1516, 1521 (9th Cir. 1993). Even so, the absence of an inmate mail security problem at the Jail enervates Defendants' contention that the postcard-only policy is rationally related to enhancing security. *Cf. Mauro*, 188 F.3d at 1060 n.3 ("Although it is not required that prison officials be able to show that the prohibited materials have actually caused problems in the past, . . . their ability to do so certainly strengthens their case." (internal citation omitted)). *Turner* does not give prison officials a "blank check" to restrict constitutional rights. *See Johnson v. California*, 543 U.S. 499, 547 (2005) (Thomas, J., dissenting).

In the absence of evidence demonstrating an inmate mail security problem, and without a credible explanation of why a postcard-only policy is more effective at preventing the introduction of contraband than opening envelopes and inspecting their contents, the Court concludes that the postcard-only policy not rationally related to enhancing jail security. Further, the Ninth Circuit has regularly rejected claims that policies broadly prohibiting certain classes of mail have a rational relationship to enhancing security. *See, e.g., PLN I*, 238 F.3d at 1150 (correctional institution "has presented no evidence supporting a rational distinction between the risk of contraband in subscription non-profit organization standard mail and first class or periodicals mail"); *Morrison v. Hall*, 261 F.3d 896, 902 (9th Cir. 2001) ("[A]lthough the defendants presented evidence that contraband is sometimes included in bulk rate, third, and fourth class mail, the defendants have failed to present any evidence that the risk of contraband in first or second class mail is any lower than the risk of contraband in mail that is sent bulk rate, third, or fourth class[.]"); *Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 923 (9th Cir. 2003) (invalidating requirement that books mailed to inmates have an approved book label or vendor stamp as not rationally related to reducing contraband, in part because correctional institution searches mail regardless); *PLN II*, 397 F.3d at 700 (overturning ban on requested bulk mail).

With respect to promoting efficiency, Defendants adopted the postcard-only policy in order to save time. There is a common-sense connection between the postcard-only policy and promoting efficiency: Postcards do not need to be opened and they have no contents that need inspection (although their text may still need to be read for security purposes). PLN presented convincing evidence, however, to refute this common-sense connection. Sergeant Rigdon testified that the increased amount of time to open and inspect a letter compared to inspecting a postcard amounted to only a few seconds or moments. On average, the Jail processed approximately 37 pieces of incoming and 35 pieces of outgoing mail each day. Thus the combined savings accrued under a postcard-only policy could amount to only several minutes each day. Defendants concede that "the time savings for the [J]ail was, at best, minimal." Defs.' Post-Trail Br. at 8. The *de minimis* savings in time achieved by the postcard-only policy is too small to create a rational connection between the policy and promoting efficiency at the Jail. *See PLN I*, 238 F.3d at 1151 ("We do not believe that requiring delivery of non-profit organization standard mail will unduly burden the [correctional institution]."); *Morrison*, 261 F.3d at 903 (noting that in *PLN I*, "we held that the 'efficient use of staff time' argument cannot justify an effective ban on non-profit subscription publications"); *PLN II*, 397 F.3d at 700 (rejecting ban on for-profit subscription publications as not rationally related to controlling volume of mail).

The Court concludes, therefore, that the postcard-only policy fails to satisfy *Turner*'s rational relationship factor. Even though the rational relationship factor is the *sine qua non*, it is, nonetheless, useful to consider the remaining *Turner* factors as well. In doing so, the Court must bear in mind that the "real task . . . is not balancing these factors, but rather determining whether [Defendants] show[] more than simply a logical relation" between the postcard-only policy and their legitimate penological goals. *Beard*, 548 U.S. at 533.

### b.  Alternative avenues

The second factor of the *Turner* test "is whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "In applying this factor, 'the right in question must be viewed sensibly and expansively.'" *Mauro*, 188 F.3d at 1061 (quoting *Abbott*, 490 U.S. at 417). Thus, the Supreme Court has upheld a prohibition on inmates' ability to attend the Jumu'ah, a Muslim religious ceremony, because inmates were permitted to participate in other Muslim religious ceremonies. *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). The Supreme Court has also upheld a restrictive prisoner visitation policy in part because "inmates may communicate with persons outside the prison by letter and telephone." *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003). The Court noted that "[a]lternatives to visitation need not be ideal . . . ; they need only be available." *Id.*

The postcard-only policy erects a barrier to many forms of communication between inmates and their unincarcerated correspondents. It prevents an inmate's family from sending items such as photographs, children's report cards and drawings, and copies of bills, doctor reports, and spiritual and religious tracts. Dickerson Test. at 78-79. It prevents an inmate's friends and other correspondents from sending printed copies of articles published in newspapers or magazines, or on the internet. *See, e.g.,* Exs. 71-87. It prevents educational, community, and religious organizations from sending lessons, book and periodical offers, and fundraising appeals. *See, e.g.,* Exs. 1-15, 57-65. Finally, and perhaps most importantly, the postcard-only policy creates a hurdle to thoughtful, personal, and constructive written communications between an inmate and his or her unincarcerated family and friends. Mendoza Test. at 4-5.

As the Court explained in its preliminary injunction opinion, Dkt. 64, these are not insignificant considerations. The postcard-only policy not only restrains PLN and inmates' First

Amendment rights, it also inhibits rehabilitation. The Supreme Court has noted that "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation." *Martinez*, 416 U.S at 412.

Nonetheless, other avenues of communications are available. The Jail permits inmates to place phone calls and receive visitors. Cutright Test. at 84-85. Phone calls and visits cannot replace the ability to send items such as photographs, drawings, report cards, and bills. As the Supreme Court provided, however, the alternatives need not be ideal, only available. On balance, *Turner*'s second factor may be neutral: The postcard-only policy limits an important avenue of communication, but inmates retain other avenues.

### c.    Effects on staff, inmates, and resources

The third *Turner* factor "is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. According to *Turner*, "courts should be particularly deferential to the informed discretion of corrections officials" when accommodating a constitutional right that will have "have a significant 'ripple effect' on fellow inmates or on prison staff." *Id.* In *Turner*, the Court found that allowing certain inmate-to-inmate correspondence could "be exercised only at the cost of significantly less liberty and safety" for inmates and staff generally and, therefore, the court upheld certain restrictions on such correspondence. *Id.* at 92-93. This factor often weighs heavily when courts consider mail policies that restrict potentially disruptive content, such as depictions or descriptions of violence, escape, or criminal activity, sexually-explicit materials, and role-playing games, *see, e.g.*, *Frost*, 197 F.3d at 351-52; *Bahrampour v. Lampert*, 356 F.3d 969 (9th Cir. 2004), or where the challenged regulation saves the prison substantial resources, *see, e.g., Bazzetta*, 539 U.S. at 135.

Here, accommodating letters is unlikely to have a "significant ripple effect" on inmates and staff. As explained above, there is no evidence that a postcard-only policy is more secure than opening envelopes and inspecting their contents. In addition, the time-savings afforded to the Jail by the postcard-only mail policy is *de minimis*. Thus, the third *Turner* factor suggests that the postcard-only is not rationally related to legitimate penological goals.

### d.    Easy and obvious alternatives

The final *Turner* factor requires the court to "consider 'whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.'" *Morrison*, 261 F.3d at 905 (quoting *PLN I*, 238 F.3d at 1149). If a "claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91. This factor favors PLN. As noted above, before implementing the postcard-only policy in 2010, Defendants opened and inspected envelopes and their contents. Given that opening envelopes and inspecting their contents effectively prevents the introduction of contraband into the Jail and requires only a *de minimis* amount of additional time, it is an easy and obvious alternative.

The inmate mail policies in other correctional institutions also support this conclusion. Other jails in Oregon, as well the Washington State Department of Corrections and the United States Bureau of Prisons, have mail policies that permit inmates to send and receive letters and periodicals. Exs. 148-52. These policies provide further evidence that opening envelopes and inspecting their contents is an easy and obvious alternative to the Jail's postcard-only policy. *Morrison*, 261 F.3d at 905 (policies at other correctional institutions are relevant to consideration of fourth *Turner* factor).

### e.      Other case law

In their post-trial brief, Defendants cite to several cases in which other district courts have upheld postcard-only mail policies. Only two cases, however, thoroughly considered the *Turner* factors: *Covell v. Arpaio*, 662 F.Supp.2d 1146 (D. Az. 2009) and *Althouse v. Palm Beach County Sheriff's Office*, 12-80135-CIV, 2013 WL 536072 (S.D. Fla. Feb. 12, 2013). In *Covell*, the district court held that the defendant's inmate mail policy, which limited inmates to receiving metered postcards, was reasonably related to a legitimate penological interest in reducing contraband. The district court provided two reasons for this holding. First, the inmate mail policy in *Covell* prohibited the use of postage stamps. The defendant argued that correspondents could smuggle drugs into the jail under stamps. The district court agreed. *Covell*, 662 F.Supp.2d at 1153-54. The district court's rationale on this point is not transferrable here because the postcard-only does not forbid the use of postage stamps. Second, the district court found that the defendant's postcard-only policy prevented the introduction of "notepad bindings [that] have been hollowed to conceal contraband[.]" *Id.* at 1153. In this case, however, Defendants have not pressed the same argument, nor is there any evidence that contraband has ever been introduced into the Jail in notepad bindings. Even if the evidence here had shown that notepad bindings presented a risk of contraband, the Jail could prohibit the mailing of notepads to inmates or confiscate notepads when opening envelopes and inspecting their contents. Banning inmates from receiving all letters because notepad bindings may conceal contraband is an exaggerated response to this security concern. In light of these considerations, the Court declines to follow *Covell*.

In *Althouse*, an unincarcerated citizen proceeding *pro se* challenged the Palm Beach County Sheriff's Office's ("PBCSO") postcard-only policy. The district court applied the *Turner*

test and granted summary judgment in favor of the PBCSO. 2013 WL 536072, *3-6. The court concluded that the PBCSO's postcard-only policy "logically advances the goals of institutional security and safety, and it is not an exaggerated response to those objectives." *Id.* at *6.

The Court declines to follow *Althouse*. The evidence in this case leads this Court to reach different conclusions than the *Althouse* court regarding the first and third *Turner* factors. Concerning the first *Turner* factor, the *Althouse* court found that "[s]ealed envelopes provide a greater opportunity for the introduction of drugs and weapons into jail facilities than postcards because envelopes can contain multiple pages of paper with folds and creases that lend themselves to smuggling contraband." *Id.* at *5. Evidence in this case, however, establishes that opening and inspecting letters, as the Jail did before adopting the postcard-only policy, effectively prevented the introduction of contraband into the Jail. Evidence also established that the Jail did not have an inmate mail security problem before adopting the postcard-only policy. Thus, in this case, the postcard-only policy does not bear a rational relationship to enhanced security.

With respect to the third *Turner* factor, the *Althouse* court noted that the PBCSO's postcard-only policy "gives the jail security staff more time to deal with prison security assignments because they can spend less time screening envelopes for contraband." *Id.* The evidence here, however, establishes that the Jail's postcard-only policy could achieve only *de minimis* savings in time.[8] Thus, in this case, the postcard-only policy does not afford Jail staff a meaningful amount of additional time to deal with other security assignments.

---

[8] The difference in time savings may be due in part to the substantial difference in size between the PBCSO and the CCSO. The PBCSO incarcerates approximately 3,000 inmates, more than 23 times the population of the Jail in May 2012. *Id.* at *1. On a per inmate basis, however, there may not be a material difference. That issue has not been developed either in this

The Court concludes, therefore, that Defendants' postcard-only policy is not reasonably related to legitimate penological objectives. The evidence adduced at trial failed to establish that the Jail had experienced any problems with contraband entering the Jail through the mail. Even if the Jail had experienced problems with correspondents sending contraband through the mail, *no* evidence showed that opening envelopes and inspecting their contents was an ineffective or inefficient method of intercepting contraband. As the Court noted in its preliminary injunction opinion, the potential dangers posed by contraband within the Jail are undeniably serious. *See Florence v. Bd. of Chosen Freeholders*, 132 S.Ct. 1510, 1518–20 (2012). Nonetheless, jail "walls do not form a barrier separating . . . inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84.

The postcard-only policy blocks one narrow avenue for the introduction of contraband—within envelopes—at too great an expense to the First Amendment rights of inmates and their correspondents. PLN has thus proven by a preponderance of evidence that Defendants violated its First Amendment rights, as well as the First Amendment rights of inmates and their correspondents.

### 2.    Prohibition on Magazines

Defendants concede that inmates have a First Amendment right to receive magazines.[9] Defendants also concede that, in practice, they failed to deliver magazines in the Jail. Defendants have argued, however, that they did not have a "policy" prohibiting magazines in the Jail. They

---

case or in *Althouse*. Also, the plaintiff in *Althouse* was *pro se* any may not have fully explored the PBCSO's claimed time savings.

[9]  In his opening statement, counsel for Defendants stated that "the County, the Sheriff's Office was violating the Constitution and was doing so repeatedly with not accepting magazines. . . . We don't dispute that. We have never disputed that. We have admitted that." 2-5-2013 Tr. at 33

point out that the IMPs have consistently stated that inmates may receive magazines. PLN argues, however, that Defendants did have a policy of prohibiting magazines because "Defendants told staff, prisoners, and the public that it banned magazines, and few, if any, of Defendants' agents and staff were aware of the document titled 'Inmate Mail Policy' that said otherwise." Pl.'s Post-Trial Br. at 8.

Whether Defendants had a policy prohibiting magazines or whether Jail staff simply failed to deliver magazines in practice is important in establishing Defendants' liability under 42 U.S.C. § 1983. A municipality, such as Columbia County, the CCSO, and Sheriff Dickerson in his official capacity, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."[10] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Rather, to establish liability under § 1983 against a municipal defendant, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*, 436 U.S. at 694). "*Monell*'s 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective." *Los Angeles Cnty. v. Humphries*, 131 S. Ct. 447, 453-54 (2010).

The Court concludes that Defendants had a policy of prohibiting magazines. Although the IMPs permitted magazines, the inmate manuals stated that magazines were not permitted in the Jail. Jail staff relied on the inmate manuals, rather than the IMPs, to determine whether to permit inmates to receive magazines. Thus, the IMPs did not set the Defendants' policy with respect to magazines. *See Ware v. Jackson Cnty.*, 150 F.3d 873, 882 (8th Cir. 1998) ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced.").

---

[10] An "official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

Defendants also had a "custom" of prohibiting magazines. Municipal defendants may be liable under § 1983 even in the absence of a formal policy permitting the challenged conduct where the plaintiff can "show a longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (internal quotations marks and citation omitted). As described in the Findings of Fact, several CCSO staff testified that they believed and understood that magazines were not permitted in the Jail. Commander Carpenter only once observed a magazine arrive by mail for an inmate, and the Jail staff rejected it. The CCSO's website expressly stated that magazines were not permitted in the Jail. Inmates were advised, both in a memorandum prepared by Sergeant Cutright, and in response to individual requests, that magazines were not permitted. The evidence is overwhelming that the Jail had a custom of prohibiting magazines. The Court concludes, therefore, that because Columbia County, the CCSO, and Sheriff Dickerson in his official capacity had a policy or custom of prohibiting inmates from receiving magazines, those Defendants are liable under § 1983 for violations of inmates' First Amendment right to receive magazines. As noted above, Defendants have stipulated that they rejected numerous issues of PLN's journals. PLN has, therefore, proven by a preponderance of evidence that Defendants violated its First Amendment rights.

### 3. Notice and appeal policy

Inmates have a "Fourteenth Amendment due process liberty interest in receiving notice that [their] incoming mail is being withheld by prison authorities." *Frost*, 197 F.3d at 353. The Ninth Circuit has not addressed what specific procedural due process safeguards a correctional institution must provide. In *Martinez*, however, the Supreme Court affirmed a district court order that "required that an inmate be notified of the rejection of a letter written by or addressed to

him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." 416 U.S. at 418-19. Although the *Martinez* Court did not express an opinion as to whether the district court's order represented the minimum due process owed, the Court concludes that those protections represent the constitutionally required minimum degree of procedural due process. *Martin v. Kelley*, 803 F.2d 236, 243-45 (6th Cir. 1986) (holding that due process safeguards described in *Martinez* are the minimum owed).

Defendants concede that inmates and their correspondents have a constitutional right to due process and that Defendants failed to satisfy that right. Opening Statement at 35; Defs.' Trial Br. at 4; Dkt. 203. Even so, Defendants have not unequivocally admitted that their IMPs were constitutionally deficient with respect to due process. Rather, they have admitted only that the Jail failed to afford inmates and their correspondents procedural due process in practice. *Id.* As discussed above, whether Defendants maintained an unconstitutional policy or custom or whether, instead, Jail staff failed to afford procedural due process safeguards in practice is important in determining whether Columbia County, the Columbia County Sheriff's Office, and Sheriff Dickerson in official capacity may be held liable under §1983. *Monell*, 436 U.S. at 694; *Humphries*, 131 S. Ct. at 453-54.

The Court concludes that the IMP in effect at the time PLN filed this action, the October 2011 IMP, failed to provide a constitutionally adequate minimum degree of due process. As described in the Findings of Fact, the October 2011 IMP provided that inmates should receive notice when the Jail rejected a piece of incoming mail. Ex. 113. That IMP also provided that the inmate must be told the reason why the mail was rejected and be given an opportunity to appeal the rejection to the Jail commander. *Id.* Despite those protections, however, the October 2011

IMP was constitutionally deficient in two areas. First, it failed to provide that inmates' correspondents be given notice and an opportunity to appeal the Jail's decision to reject incoming mail. Second, it did not provide that inmates receive notice and an opportunity to appeal when the Jail rejected their outgoing mail.

In addition, the Court concludes that Defendants had a custom of failing to provide notice and an opportunity to appeal, even when the Jail's IMPs provided that such notice was required. Defendants stipulated that they "did not provide . . . the prison-addressees due process notice or an opportunity to appeal the censorship decisions when the Jail censored" PLN's mail. Dkt. 203. Defendants also stipulated that they "did not provide . . . the prisoner-addressees due process notice or an opportunity to appeal the censorship decisions when the Jail censored" mail that Ms. Lennox sent to inmates. *Id.* CCSO staff admitted that the Jail rarely provided inmates with notice. Cutright Test. at 61, 64-66. This evidence establishes that the Jail had a "longstanding practice or custom" that constituted its "standard operating procedure." The Court concludes that Defendants had both a policy and custom of failing to afford constitutionally sufficient due process. PLN thus has proven by a preponderance of evidence that Defendants violated its Fourteenth Amendment rights, as well as the Fourteenth Amendment rights of inmates and their correspondents.

## C.    Permanent Injunction

To obtain a permanent injunction, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547

U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" *Id.* Where, as here, a plaintiff seeks an injunction against a state or local government agency, "federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (internal quotation marks and citation omitted).

     1.      **Postcard-Only Policy**

          a.      **Irreparable injury**

PLN has demonstrated irreparable harm because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Assoc. Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) ("We have stated that an alleged constitutional infringement will often alone constitute irreparable harm." (internal quotation marks, citation, and alterations omitted)).

          b.      **Inadequacy of damages**

In cases, like this one, that involve constitutional violations, this factor merges with the first factor. *See Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), *rev'd and remanded on other grounds*, 131 S. Ct. 746 (2011). Because PLN has shown that Defendants violated the First Amendment, and because the loss of First Amendment freedoms constitutes irreparable harm, PLN has demonstrated that monetary damages are inadequate.

c.       **Balance of equities**

The third factor requires the court to balance the equities. "In assessing whether the plaintiffs have met this burden, the district court has a duty to balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (internal quotation marks, citation, and alteration omitted). PLN has established that the Jail's postcard-only policy burdens its First Amendment rights, as well as the First Amendment rights of inmates and their correspondents. Defendants face the possibility of spending a minimal amount of additional time each day opening envelopes and inspecting their contents. The constitutional hardship is far greater than the insignificant impact on Defendants' time and resources.

During trial, Sheriff Dickerson testified that he would not re-adopt the postcard-only policy if the Court did not issue a permanent injunction but merely declared the policy unconstitutional. Dickerson Test. at 132. Thus, the Court must consider whether injunctive relief is needed beyond declaratory relief. The party seeking a permanent injunction "must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). The Court takes the Sheriff at his word that he would not re-adopt a postcard-only policy if the Court issues a declaratory judgment and does not order a permanent injunction. Even so, however, the Court still concludes that the balance of equities favors a permanent injunction enjoining the postcard-only policy. The sheriff's office is an elected position and a sheriff does not have the authority to bind his or her successor. Moreover, Defendants did not voluntarily and promptly amend their IMP to remove the postcard-only policy after PLN filed this action. Rather, Defendants retained the postcard-only policy until the Court issued its preliminary injunction. In

addition, Defendants have never admitted that the postcard-only policy is unconstitutional. In light of these considerations, the Court concludes that the balance of equities tips in favor of granting a permanent injunction.

### d.    Public interest

"The public interest inquiry primarily addresses [the] impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir.2002). "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction." *Stormans, Inc.*, 586 F.3d at 1138-39 (internal quotation marks, citation, and alteration omitted). Here, however, the public interest favors entering a permanent injunction. A permanent injunction enjoining Defendants from enforcing a postcard-only policy will permit inmates and non-party members of the public to more easily and effectively communicate with each other by mail. The parties have not suggested that a permanent injunction will affect any other non-parties.

### e.    Scope of injunction

After considering each of the four factors set forth by the Supreme Court in *eBay*, the Court concludes that a permanent injunction enjoining the postcard-only policy is warranted. Before issuing a permanent injunction, however, the Court must consider the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. The PLRA provides:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a). An "injunction employs the least intrusive means necessary when it heels close to the identified violation, and is not overly intrusive and unworkable and would not require for its enforcement the continuous supervision by the federal court over the conduct of state officers."[11] *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1153 (9th Cir. 2004) (internal quotation marks, citations, and alterations omitted).

As described in the Conclusion below, in addition to providing declaratory relief, the Court will issue a permanent injunction enjoining Defendants from restricting all incoming and outgoing inmate personal mail to postcards only. This injunction applies only to the Columbia County Jail and to no other correctional institution. The injunction will address only the postcard-only inmate mail policy and does not intrude on any other aspect of the Jail's administration. The injunction will not provide for ongoing Court supervision and will not require Defendants to submit compliance reports, institute trainings, or submit revised policies to the Court for review. The Court finds, therefore, that such an injunction would be narrowly drawn, extend no further than necessary to correct the First Amendment violations, and is the least intrusive means necessary to correct the violation of the Federal right. *See id.* (upholding district court injunction where injunction did not require court supervision and was only broad enough to enjoin the unconstitutional policy).

---

[11] In its Suggested Findings of Fact and Conclusions of Law, PLN contends that the PLRA does not apply to this case because the PLRA only applies to actions brought by prisoners. Dkt. 138 at 35. PLN is incorrect and the cases PLN cites for its contention do not so hold. Certain sections of the PLRA apply only to suits by prisoners, such as, for example, § 803, 42 U.S.C.A. § 1997e, which requires prisoners to exhaust administrative remedies before bringing actions under 42 U.S.C. § 1983. Section 802 of the PLRA, 18 U.S.C. § 3626, quoted above, however, applies to "*any* civil action with respect to prison conditions." (Emphasis added.) No provisions in § 802 limit its application to suits brought by prisoners.

2.   **Magazines**

a.   **Irreparable injury**

As noted above, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. Consequently, PLN has satisfied the first factor of the *eBay* test.

b.   **Inadequacy of damages**

PLN has also satisfied the second factor of the *eBay* test because, as explained above, "constitutional violations cannot be adequately remedied through damages[.]" *Nelson*, 530 F.3d at 882.

c.   **Balance of Equities**

As explained above, in assessing this factor, the Court "has a duty to balance the interests of all parties and weigh the damage to each." *Stormans, Inc.*, 586 F.3d at 1138 (internal quotation marks, citation, and alteration omitted). A permanent injunction requiring Defendants to deliver magazines to inmates would protect the First Amendment rights of both inmates and publishers. Defendants have not stated that a permanent injunction would tax their resources. Defendants argue, however, that the equities do not favor an injunction for a different reason. An injunction is unnecessary, they contend, because "the [J]ail voluntarily implemented a practice to ensure that the written policy permitting magazines was followed." Defs.' Post-Trial Br. at 13.

The "court's power to grant injunctive relief survives discontinuance of the illegal conduct." *W. T. Grant Co.*, 345 U.S. at 633. Nonetheless, as noted above, "the moving party must satisfy the court that relief is needed." *Id.* "In determining whether to impose an injunction where a defendant has ceased the offending conduct, courts may consider 'the bona fides of the defendant's expressed intent to comply' with the law, 'the effectiveness of the discontinuance,'

and 'the character of the past violations.'"[12] *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012) (quoting *W. T. Grant*, 345 U.S. at 633; internal alterations omitted).

These considerations weigh against issuing an injunction. It is true that for many years Defendants unconstitutionally prohibited magazines in the Jail. Even so, Defendants have admitted that inmates have a First Amendment right to receive magazines and that Defendants violated that right repeatedly by repeatedly rejecting issues of PLN's journal. Sheriff Dickerson credibly testified that he did not know that the First Amendment required the Jail to allow inmates to receive magazines when he took office in 2009. Dickerson Test. at 237. The Sheriff also credibly testified that had he known, he would have ensured that inmates could receive magazines. *Id.* The IMPs have consistently provided that inmates may receive magazines. Defendants have informed CCSO staff that they should rely on the IMPs when processing mail and have held two training sessions in which the most recent IMPs were read to CCSO staff. Rigdon Test. at 197-98. The Court concludes that Defendants have made a genuine and credible effort to correct their unconstitutional prohibition on magazines. The balance of equities thus tips against issuing a permanent injunction with regard to magazines.

### d.    Public Interest

As noted above, the "public interest inquiry primarily addresses [the] impact on non-parties rather than parties." *Sammartano*, 303 F.3d at 974. A permanent injunction would benefit

---

[12]   The question of whether a defendant's voluntary discontinuance of illegal conduct tips the balance of equities against issuance of a permanent injunction bears many similarities to the mootness question, discussed above. Despite the similarities, however, "the two inquiries are strikingly different." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 n.10 (11th Cir. 2007). A "defendant seeking dismissal on mootness grounds under the doctrine of voluntary cessation bears the extremely heavy burden of showing that it is absolutely clear that he will not revert to his old ways. But whether a permanent injunction is appropriate . . . turns on whether the plaintiff can establish by a preponderance of the evidence that this form of equitable relief is necessary." *Id.*

inmates and magazine publishers by ensuring that inmates receive the magazines to which they subscribe. Accordingly, this factor favors an injunction.

On the whole, however, the Court concludes that a permanent injunction is not warranted with respect to Defendants' unconstitutional policy or custom prohibiting inmates from receiving magazines. Defendants have expressed a credible willingness to comply with the law. Where, as here, "constitutional violations are found, but state officials have shown their readiness to meet constitutional requirements, the court should limit its initial response to a grant of declaratory relief." *Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985).

### 3. Notice and appeal provisions

#### a. Irreparable harm

Unlike with PLN's First Amendment claim, it is not clear that PLN has suffered irreparable harm merely because Defendants have failed to provide the required procedural due process. There is no question that the denial of First Amendment rights constitutes irreparable harm. *Elrod*, 427 U.S. at 373. Moreover, under Ninth Circuit precedent, an "alleged constitutional infringement will often alone constitute irreparable harm." *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) (citing Wright & Miller, 11 FEDERAL PRACTICE AND PROCEDURE § 2948 at 440 (1973)). The Ninth Circuit has not held, however, that irreparable harm inevitably flows from deprivations of procedural due process. Other circuits have held that the denial of due process does not create a presumption of irreparable harm. *See, e.g.*, *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 81 (1st Cir. 2009) (denial of procedural due process, without more, does not automatically trigger a finding of irreparable harm); *Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000) (presumption of irreparable harm only applicable to invasion of privacy and violation of First Amendment rights).

The Court need not resolve whether Defendants' unconstitutional deprivation of PLN's right to procedural due process constitutes irreparable harm. As discussed below, the Court finds that the balance of equities tips in favor of not issuing a permanent injunction on this issue. The Court, therefore, leaves this question for another day or another court.

### b. Inadequacy of damages

Because the Court finds that the balance of equities strongly favors not issuing a permanent injunction, the Court declines to address this factor.

### c. Balance of Equities

Defendants' most recent IMP, the July 2012 IMP, provides that CCSO staff must provide notice and an opportunity to appeal to both the sender and the recipient of incoming and outgoing mail when that mail is censored or rejected. Under the standard described in *Martinez* and adopted above, this is constitutionally sufficient procedural due process. Accordingly, the Court must determine whether the equities favor a permanent injunction even though Defendants have voluntarily implemented a constitutional policy. As discussed above, three factors are relevant in "determining whether to impose an injunction where a defendant has ceased the offending conduct." *KarenKim*, 698 F.3d at 100. Those are (1) the bona fides of the defendant's expressed intent to comply with the law; (2) the effectiveness of the discontinuance; (3) and the character of the past violations. *Id.*

These factors tip the balance of the equities against issuance of a permanent injunction on this issue. Defendants promptly admitted that they repeatedly violated the Fourteenth Amendment. Furthermore, Sheriff Dickerson testified credibly that the Jail would not continue to violate the Constitution. PLN has not presented any evidence suggesting that the Jail has continued to violate its or anyone else's procedural due process rights since Defendants adopted

the July 2012 IMP. The Court is cognizant that the Jail consistently failed to afford procedural

due process before PLN filed this action. Nonetheless, over the last year, Defendants have

displayed a genuine determination to correct their deficient notice and appeal policies. Thus, the

balance of equities counsels against issuing a permanent injunction.

### d. Public Interest

Finally, the Court must consider the public interest. The "public interest inquiry primarily

addresses [the] impact on non-parties rather than parties." *Sammartano*, 303 F.3d at 974. A

permanent injunction requiring Defendants to provide constitutionally sufficient procedural due

process to inmates and their correspondents would ensure that inmates' correspondents, who are

not party to this case, are guaranteed their constitutional rights. Consequently, the inmates and

their correspondents would benefit. This factor favors an injunction.

On the whole, however, a permanent injunction is not warranted. Defendants have

voluntarily amended their IMP to provide the required level of procedural safeguards. As stated

above, where "constitutional violations are found, but state officials have shown their readiness

to meet constitutional requirements, the court should limit its initial response to a grant of

declaratory relief." *Morrow*, 768 F.2d at 627.

### D. Declaratory Relief

The Declaratory Judgment Act, 28 U.S.C. § 2201, allows individuals to seek a

declaration of the constitutionality of the disputed governmental action. *See Duke Power Co. v.

Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 71 n.15 (1978). To issue a declaration, the Court

must address two conditions. "First, the court must inquire whether there is a case of actual

controversy within its jurisdiction." *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir.

1994). Second, "the court must decide whether to exercise that jurisdiction. The statute gives discretion to courts in deciding whether to entertain declaratory judgments[.]" *Id.* at 143-44.

The Court concludes that declaratory relief is appropriate for both PLN's free speech claims (concerning both the postcard-only policy and the magazine policy) and PLN's due process claim (concerning the notice and appeal policy). First, for the reasons discussed above, the Court concludes that PLN has standing for both claims and neither claim is moot. There is, therefore, an actual controversy.

Second, exercise of the Court's discretion is appropriate. The Court "may consider equitable, prudential, and policy arguments when deciding whether" to exercise its discretion to issue a declaration. *Veoh Networks, Inc. v. UMG Recordings, Inc.*, 522 F. Supp. 2d 1265, 1271 (S.D. Cal. 2007) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007)). Equitable considerations weigh in favor of awarding declaratory relief. As described above, Defendants' postcard-only policy, magazine policy, and notice and appeal policy violated the First and Fourteenth Amendments. Those policies resulted in numerous individual constitutional violations. Declaratory relief will, therefore, serve to vindicate the rights of PLN and the rights of inmates and their unincarcerated correspondents. Prudential considerations also favor declaratory relief. Declaratory relief will clarify the degree of constitutional protection that must be afforded to inmate mail and, accordingly, will provide guideposts to Defendants in the event they wish further to amend their IMP. Accordingly, the Court will enter declaratory relief.

## CONCLUSION

The Court will issue a separate Order that **PERMANENTLY ENJOINS** Defendants from restricting all incoming and outgoing inmate personal mail to postcards only. The Order will provide that Defendants shall not refuse to deliver or process personal inmate mail solely on

the grounds that it is not on a postcard. In the Order, the Court will also **DECLARE** that inmates have a First Amendment right to receive magazines and that it would be unconstitutional for Defendants to refuse to deliver magazines to inmates solely because they are magazines. The Court will also **DECLARE** that inmates and their unincarcerated correspondents have a Fourteenth Amendment right to procedural due process when Defendants reject their mail and that, at a minimum: (1) an inmate must be notified when Defendants reject correspondence written by or addressed to the inmate; (2) senders of rejected correspondence must be given a reasonable opportunity to appeal the rejection; and (3) appeals must be referred to a prison official other than the person who originally rejected the correspondence. Within 28 days from the date of these Findings of Fact and Conclusions of Law, the parties shall inform the Court whether there is any need for the Court to proceed further with regard to Plaintiff's claim for money damages. If there is no such need, the parties shall submit to the Court by that deadline, either jointly or separately, a proposed form of Final Judgment that contains proposed permanent injunctive and declaratory relief consistent with these Findings and Conclusions.

IT IS SO ORDERED.

Dated the 24th day of April, 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge